# UNITED STATES COURT OF APPEALS

## FOR THE FIFTH CIRCUIT

---

No. 98-51009

---

TOMMY RAY JACKSON,

Petitioner-Appellant,

versus

GARY L. JOHNSON, DIRECTOR, TEXAS
DEPARTMENT OF CRIMINAL JUSTICE,
INSTITUTIONAL DIVISION,

Respondent-Appellee.

---

Appeal from the United States District Court
For the Western District of Texas

---

October 29,1999

Before POLITZ, DAVIS, and JONES, Circuit Judges.

POLITZ, Circuit Judge:

Tommy Ray Jackson appeals the denial of habeas relief. He directs his contentions to the penalty phase of his capital trial, maintaining that his constitutional rights were violated by a **Brady** violation, the impermissible comments of the prosecution, and the admission of evidence of an unadjudicated offense. For the reasons assigned, we affirm the judgment appealed.

## BACKGROUND

On November 17, 1983, Rosalind Robison, a twenty-four year old University of Texas student, disappeared. Alerted to her disappearance, state and local authorities kept on the lookout for her and her vehicle and, within a few days, they

stopped Tommy Ray Jackson as he was driving Robison's white Oldsmobile. When questioned, Jackson said that he had borrowed the car first from a Robert Richardson and later from a Richard Robertson. A search of the trunk revealed Robison's purse and a box labeled "Rosalind Robison" containing some of her personal effects. Jackson was arrested and Robison's ATM card was discovered on his person.

Approximately one month later, Robison's body was discovered at a secluded gravel pit twenty miles from Austin. She had been shot execution-style, at close range and in the back of the head, and a 0.25 caliber bullet was recovered from her cranial cavity. Evidence indicated that she had been kneeling at the time the fatal shot was fired. Her hands had been bound behind her back with a blue and white bandana and her body was partially covered by gravel.[1] Pubic hair that was a microscopic match to that of Jackson was recovered from Robison's undergarments and also from the backseat of her vehicle.

At the time of the incident, Jackson had been sharing a room in a halfway house with James Otis Clary. The authorities learned that Jackson and Clary had spent the fateful day together. After numerous interviews the state and Clary entered into a plea agreement. Clary agreed to provide truthful testimony in Jackson's capital murder trial and the state agreed not to proceed with capital

---

[1] Gravel from the scene was microscopically similar to that found (1) embedded in the tread of the wheels of Robison's car, and (2) in the cabin of the vehicle itself.

charges against him.[2]

Because Clary plays a central role in two of Jackson's claims, at the threshold we describe his trial testimony in some detail, noting a portion of the evidence that corroborates his testimony. Additional testimony and evidence will be underscored during the discussion of the several issues raised by Jackson.

At the trial, Clary testified to the following events. During the weeks leading up to the incident, he and Jackson surveilled two stores that they intended to rob. The pair believed that it would be necessary to get a vehicle to carry out these robberies. Jackson secured a 0.25 caliber pistol from a friend to facilitate their theft of a vehicle.[3] On the afternoon of the incident, Jackson and Clary drank beer and smoked marihuana. Later that evening, the two men walked about downtown Austin looking for an opportunity to steal a vehicle. After walking for some time they stopped for a few beers before heading to the University of Texas campus.

Arriving on the campus around 10:00 p.m., they saw a woman alone walking toward a car in a parking lot that contained only a few other cars. There were no other people in the immediate vicinity. Jackson told Clary that this was their opportunity to steal a vehicle. The ill-fated woman, Rosalind Robison, opened her car door but dropped something, which she was attempting to pick up, when Jackson rapidly approached her with his firearm drawn. Jackson pushed her into

---

[2] Rather than face capital charges, Clary agreed to plead guilty to kidnapping, with the state recommending a life sentence.

[3] The friend corroborated the fact that Jackson had rented a 0.25 caliber pistol shortly before the incident; Jackson did not offer the reasons why the gun was needed and the friend did not inquire.

the front seat of the vehicle and slid behind the wheel. Clary got in the front seat so that Robison was positioned between them. Robison pled with the two men not to hurt her. She said that she did not have any money, but if it was money that they wanted, she had an ATM card and could withdraw cash from a bank machine. Jackson passed the pistol to Clary to keep Robison under control as he drove to an ATM machine. Upon arriving at a bank, Clary and Robison exited the vehicle and Robison withdrew $50.[4] She gave the money to Jackson.

Jackson drove from the bank to Interstate 35, traveled a short way, and then pulled off to the side. Jackson then ordered Robison into the back seat of the vehicle with him and instructed Clary to continue driving on I-35. Robison pled that she not be injured, stating that she would do anything that was asked of her. At Jackson's mention of sex, Robison replied that she could not engage in sexual intercourse because she was menstruating; Jackson said that would not deter him. Jackson then raped Robison, who did not cry out or struggle.[5] Clary recalled that Robison asked for some sort of napkin and that Jackson pulled a white object from the glove box.[6]

---

[4] This particular ATM was equipped with a video camera but, because the video camera had not been reset after a power outage earlier that day, the jury was denied video-taped evidence of this portion of the incident. Nonetheless, bank records confirmed that Robison made a $50 withdrawal at 10:39PM on the night of the incident.

[5] Robison's father testified that he had advised his daughter not to struggle if she ever found herself in such circumstances. She received similar advice when she worked at a hospital in Houston.

[6] A sperm-stained tissue was recovered from Robison's vehicle. The stain did not allow for extensive analysis but it was determined that either Jackson or Clary could have been responsible for it.

Jackson ordered Clary to pull over and they resumed their original positions in the front seat. As they traveled along I-35, Clary said Jackson's name when inquiring as to their destination; Jackson met Clary's question with silence. Shortly thereafter, Jackson exited the highway, eventually stopping at a gravel pit. Jackson reclaimed the pistol from Clary before Clary raped Robison in the vehicle's back seat. Thereafter, Jackson ordered Robison out of the vehicle. The three walked to a pile of gravel and when they reached it, Jackson stated his intent to kill Robison because she heard Clary use his name. Robison pled for her life. Standing behind her with the pistol, Jackson ordered Robison to her knees. Jackson told Robison that she would never again give anyone a ride as he fired the lethal shot. Jackson asked Clary to help him dispose of her body. Clary refused, stating that they had never planned to kill anyone. Clary returned to the car and Jackson did likewise approximately ten minutes later.[7]

Clary said that there was virtually no conversation about the murder between him and Jackson. On the ride back to Austin, however, Clary repeated his concern that their plan did not involve hurting anyone, to which Jackson replied: "Shut up. Let me handle this." Once back in Austin, Jackson and Clary stopped at two nightclubs, where they drank beer and shot pool. After leaving the nightclubs, Jackson and Clary stopped at a friend's house and drank more beer and smoked

---

[7] Although Robison's hands had been bound behind her back with a blue and white bandana, Clary could not recall this detail. Several witnesses testified that Jackson was known to wear a blue and white bandana. No witness could recall Clary wearing a blue and white bandana.

5

marihuana.[8]

Jackson was convicted of capital murder. The jury unanimously found beyond a reasonable doubt that (1) Jackson had acted deliberately in causing Robison's death and with the reasonable expectation that her death would result, and (2) there was a probability that he would commit criminal acts of violence constituting a continuing threat to society.[9] Jackson was sentenced to death. The Texas Court of Criminal Appeals affirmed the judgment of the trial court on February 3, 1988, and the United States Supreme Court denied Jackson's petition for writ of certiorari on June 30, 1988.[10]

In October 1988, Jackson petitioned the state court for a writ of habeas corpus. Jackson's petition was denied by the state court which issued findings of fact and conclusions of law in November 1994, and supplemented same in August 1995.[11] The Texas Court of Criminal Appeals determined that the trial court's findings and conclusions were supported by the record and denied relief without written opinion.[12] Shortly thereafter, Jackson petitioned for habeas relief in the federal district court, raising eighteen claims. After the district court denied relief

---

[8] Individuals that had been at the apartment confirmed that Jackson and Clary arrived at the complex in a white Oldsmobile around midnight a few days before Jackson's arrest.

[9] TEX. CODE CRIM. P. ANN. art. 37.071 (1981).

[10] **Jackson v. State**, 745 S.W.2d 4 (Tex. Crim. App.), *cert. denied*, 487 U.S. 1241 (1988).

[11] **Ex parte Jackson**, No. 84-043-KA (Williamson County D. Ct. Aug. 31, 1995).

[12] **Ex parte Jackson**, Writ No. 29,574-01 (Tex. Crim. App. Oct. 2, 1996).

on all of his claims,[13] Jackson applied for a certificate of appealability on seven. The district court granted a COA on three; this court denied Jackson's application for COA on the remaining four claims. Jackson's challenges all pertain to the penalty phase of his capital trial. He contends that his constitutional rights were transgressed by a **Brady** violation, by impermissible comments of the prosecution, and by the admission of evidence of an unadjudicated offense.

## ANALYSIS

### I. **Brady** Claim

Jackson maintains that there is a reasonable probability that he would have been sentenced differently had the prosecution disclosed the prior inconsistent statements of Clary. The authorities obtained several statements from Clary who, during Jackson's trial, was described as initially evasive, but who increased the significance of his role with each successive interview. Jackson was not provided with four of Clary's statements. He contends that these statements went beyond merely providing additional detail,[14] and argues that knowledge of the specifics of Clary's various statements would have better armed him to impeach Clary's testimony. Jackson further maintains that the state was able to paint Clary's several statements as merely increasing in detail because he did not have the statements and was not able to establish for the jury the true nature of Clary's shifting version

---

[13] **Jackson v. Johnson**, No. 96-CA-716-SS (W.D. Tex. Aug. 10, 1998).

[14] Jackson details several of these variations, including when Clary "had sex" with the victim (*after* arriving at the site where her body was found or *during* the drive to the site); the events at the any-time teller machine; whether Clary saw that the victim's hands were bound; and differences in his own and Jackson's activities while at the death scene site.

7

of the truth. Jackson emphasizes the significance of Clary's testimony at sentencing, underscoring the fact that the state argued that the triggerman should receive a death sentence and only Clary implicated Jackson as the actual triggerman. From this Jackson argues that only non-credible evidence supported an affirmative response by the jury on the special issue concerning the deliberate nature of the act.

Under **Brady v. Maryland**, suppression by the state of material evidence favorable to the accused, after a request to examine such evidence, violates the accused's fourteenth amendment guarantee to due process.[15] To be entitled to habeas relief on a **Brady** claim, a petitioner must establish that (1) the state suppressed or withheld evidence, (2) which was both favorable and (3) material to the defense.[16] The state court determined that the evidence was not material. The state court's determination was not an unreasonable application of federal law nor was it based upon an unreasonable determination of the facts. No relief is warranted.[17]

Suppression or Withholding of Evidence

The state habeas trial court determined that Clary's prior statements were not

_____

[15] 373 U.S. 83 (1963).

[16] **Strickler v. Greene**, 119 S. Ct. 1936 (1999).

[17] 28 U.S.C. § 2254(d). Jackson's petition for federal habeas relief was filed on October 17, 1996, after the Antiterrorism and Effective Death Penalty Act was signed into law on April 24, 1996, so the AEDPA standard of review applies to his petition. **Lindh v. Murphy**, 521 U.S. 320 (1997); **Williams v. Cain**, 125 F.3d 269 (5th Cir. 1997), *cert. denied*, 119 S. Ct. 144 (1998).

specifically requested by Jackson. Jackson moved for **Brady** material, and at a hearing on that motion the state agreed to turn over such information. Though the trial court did not order such disclosure, it considered same appropriate. Although not *specifically* requested, Jackson's earlier request for **Brady** evidence,[18] suffices to raise this claim. The essential question before us is whether the evidence was favorable and material.

Favorable to the Defense

Favorable **Brady** evidence includes information that could be used to impeach the credibility of the state's witnesses.**[19]** Jackson's contention that the various inconsistent statements by Clary could have been used to impeach his credibility is well-founded. The district court determined that these prior statements by Clary were favorable to the defense. We agree with that determination.[20] We proceed then to address the materiality element of the **Brady** inquiry.

Before doing so, we must pause to address another of Jackson's concerns. Because only Clary specifically pointed to Jackson as the triggerman, Jackson

---

[18] **Kyles v. Whitley**, 514 U.S. 419 (1995) (**Brady** claim might arise despite only general request for exculpatory evidence); **United States v. Miranne**, 688 F.2d 980 (5th Cir. 1982) (noting government's ongoing obligation under **Brady**); *see also* **Strickler**, 119 S. Ct. at 1945 n.12 (noting that the prosecutor is responsible for disclosing any favorable evidence known to others acting on the government's behalf in the case, including the police).

[19] **Smith**, 904 F.2d at 964 ("impeachment material is clearly exculpatory and qualifies as **Brady** material").

[20] **Smith**, 904 F.2d at 964-69 (impeachment evidence is favorable even if cumulative).

argues that it was critical for him to be able to impeach Clary. Because the state sought a death sentence for the triggerman, identifying Jackson as the triggerman was crucial. The statements in question would have provided general impeachment information, but we are by no means persuaded that the statements would have enabled Jackson to impeach Clary on the specific issue of the identity of the triggerman.[21] The four statements sought by Jackson explicitly or implicitly identify Jackson as the triggerman. Two of the statements include confessions by Jackson to the shooting. Each of the four statements placed Jackson alone with the decedent in the secluded location where the body was later discovered; each noted that Jackson was armed; and each related that, though both Jackson and Robison left the vehicle together, only Jackson returned to the vehicle before Jackson left the scene with Clary. While the changing details of these statements provide some general impeachment material, they would not have provided impeachment on the specific issue of the identity of the triggerman. Nonetheless, these statements were favorable to the defense, and we therefore must continue the analysis.

Material to the Defense

---

[21] Jackson complains that four statements by Clary were not disclosed to him. The first of the four statements by Clary states that Jackson was armed and that Jackson confessed to the murder of Robison. The second statement reflects that Jackson pulled a firearm on Robison at an any-time teller machine; that the trio traveled to the location where Robison's body was later discovered; and that Jackson and Robison left the vehicle together but that only Jackson returned to the vehicle before he and Clary left the scene. The third statement notes that Jackson pulled a firearm on Robison at an any-time teller machine; that the trio traveled to the location where Robison's body was later discovered and the three exited the vehicle; that as Clary returned to the vehicle, he (Clary) heard a gunshot, and that only Jackson returned to the vehicle; and that Jackson confessed to the murder. The fourth statement declares that Clary saw Jackson alone with Robison; that Jackson was armed; and that Clary returned to the car before Jackson shot Robison.

10

Evidence is "material" only if there is a reasonable probability that the result of the proceeding would have been different if the evidence had been disclosed.[22] The reviewing court should consider the suppressed items collectively, not item by item.[23] The state courts effectively and the district court explicitly determined that the **Brady** material was cumulative, and thus not material. When **Brady** evidence would have only a cumulative or marginal impact on the jury's credibility assessment, habeas relief is not in order because the evidence is not material, that is, there is no reasonable probability that the result of the proceeding would have been different if the defense had been provided the evidence in question.[24]

Jackson had four other statements made by Clary, including a detailed statement that defense counsel obtained during an extensive interview. These various statements enabled Jackson to attack Clary's credibility; in fact, Jackson's own federal habeas petition reveals that "Clary's credibility was sharply called into question by defense counsel at trial . . . ." Clary admitted that he had not been

---

[22] **United States v. Bagley**, 473 U.S. 667, 682 (1985); **Smith**, 904 F.2d at 964. Though "reasonable probability" might more properly be phrased as "significant possibility," **Strickler**, 119 S. Ct. at 1956 (Souter, J., dissenting) (seeking to avoid the unjustifiable risk that courts might be misled into applying the more demanding standard, "more likely than not"), the different phraseology would not affect our conclusion on this or any other issue.

[23] **Kyles**, 514 U.S. at 436.

[24] **Pyles v. Johnson**, 136 F.3d 986, 999 (5th Cir.) (**Brady** evidence with "marginal negative impact on jury's credibility assessment" does not warrant habeas relief), *cert. denied*, 118 S. Ct. 2338 (1998); **Westley v. Johnson**, 83 F.3d 714, 725 (5th Cir. 1996) (**Brady** evidence that does not constitute "significant new evidence" does not warrant habeas relief); **Spence v. Johnson**, 80 F.3d 989, 995 (5th Cir. 1996) (**Brady** evidence that is "cumulative" does not warrant habeas relief); **Drew v. Collins**, 964 F.2d 411, 419-20 (5th Cir. 1992) (**Brady** evidence with only "incremental impeachment value" does not warrant habeas relief).

11

truthful when he first talked to the police, when he testified before the grand jury, when he talked to defense counsel, and when he talked to the sheriff on an unspecified occasion. Clary testified that he provided different accounts of the incident each time that he was interviewed, and that his trial testimony differed from his previous accounts as well. The prosecution conceded in its opening statement that Clary's credibility was open to question given his various stories. Thus, the four withheld statements by Clary correctly were labeled as cumulative; they were not material.

In light of the persuasive and abundant physical and other evidence favoring affirmative responses to the special issue questions, and in light of mitigating evidence of "little, if any, value,"[25] there was not a reasonable probability, sufficient to undermine confidence in the outcome, that the result of the proceeding would have been different if the evidence had been disclosed to the defense.[26] The district court did not commit reversible error in denying relief on this **Brady** issue.

II.     Prosecutorial Misconduct Claim

Jackson contends that improper arguments and statements by the prosecution rendered his sentencing fundamentally unfair and unreliable in violation of his guarantee to due process. Jackson complains that the prosecutor referred to his

---

[25] **Jackson v. Johnson**, No. 96-CA-716-SS, at 47 (W.D. Tex. Aug. 10, 1998).

[26] **Strickler**, 119 S. Ct. at 1955 (**Brady** evidence not material when the brutal nature of the crime, after which petitioner drank and danced, sufficed to support Virginia's special issues of "vileness" and "future dangerousness" even if the witness left unimpeached by the disputed **Brady** evidence identified petitioner as the dominant actor); **Smith**, 904 F.2d at 969 (**Brady** evidence not material when defendant presented little mitigation evidence and victim was kidnapped, robbed, sexually assaulted, and brutally slain).

refusal to testify, vouched for Clary's credibility, invoked the status of the government as a basis for answering affirmatively to the special issue questions, and inflamed the passions and prejudices of the jury. Jackson raised the same issues in his state habeas proceeding. The federal district court described as incomprehensible the state habeas trial court's resolution of this issue.[27] The one page order by the Texas Court of Criminal Appeals denying habeas relief indicates only that the record supports the findings and conclusions of the trial court. AEDPA provides that an application for a writ of habeas corpus on behalf of a person in custody under a judgment of a state court shall not be granted with respect to any claim that was adjudicated on the merits in state court proceedings unless that adjudication was contrary to clearly established federal law or based upon an unreasonable determination of the facts in light of the evidence.[28] Our trial court determined that the state habeas courts' resolution of the issue commanded no deference because it obviously was not an adjudication on the merits.

When faced with a silent or ambiguous state habeas decision, the federal

---

[27] The state habeas trial court employed the following boilerplate language in resolving Jackson's claim:

> Findings of Fact. This claim presents no controverted, previously unresolved issues of fact which are material to the legality of the applicant's sentence. The claim presents only a legal argument about the facts that appear in the appellate record. No evidence on this claim was introduced by either party in the habeas corpus proceeding.
> Conclusions of Law. The petitioner has not cited any authority or made any argument to support his claim that state law provides some protection that is different from federal constitutional protections.

[28] 28 U.S.C. § 2254(d); **Fisher v. State**, 169 F.3d 295 (5th Cir. 1999).

13

court should "look through" to the last clear state decision on the matter.[29] Jackson did not present these particular claims on direct appeal, so we must determine whether the noted adjudication was "on the merits." In making this determination, we consider "(1) what the state courts have done in similar cases; (2) whether the history of the case suggests that the state court was aware of any ground for not adjudicating the case on the merits; and (3) whether the state courts' opinions suggest reliance upon procedural grounds rather than a determination on the merits."[30] First, our research has produced no clear guidance on whether Texas courts treat such dispositions as "on the merits." The parties have not directed our attention to any dispositive precedent. Second, the history of the case suggests that there were no objections at trial to the comments about which Jackson now complains. "In Texas, the general rule is that any impropriety in the State's argument is waived by a defendant's failure to make a proper and timely objection."[31] This factor favors a determination that the adjudication was not on the merits. Third, the failure to mention procedural grounds by the state habeas courts has aided this court's resolution in the past.[32] Here, there was no mention of procedural grounds by either of the state courts. The third factor weighs in favor

---

[29] **Lott v. Hargett**, 80 F.3d 161, 164 (5th Cir. 1996).

[30] **Green v. Johnson**, 116 F.3d 1115, 1121 (5th Cir. 1997).

[31] **Ortega v. McCotter**, 808 F.2d 406, 408 (5th Cir. 1987) (citing **Romo v. State**, 631 S.W.2d 504, 505 (Tex. Crim. App. 1982)).

[32] **Green**, 116 F.3d at 1121 (concluding that the claims were resolved on the merits when "[n]either the trial court's nor the Court of Criminal Appeals's order ma[de] mention of procedural grounds for denying relief").

of the conclusion that the state court disposition was on the merits. Proceeding perforce with an abundance of caution, we follow the district court's lead and conclude that for present purposes the adjudication was not "on the merits" within the intendment of the AEDPA.

Jackson's failure to object, however, raises the issue whether his claim is procedurally barred. The "Texas contemporaneous objection rule constitutes an adequate and independent state ground that procedurally bars federal habeas review of a petitioner's claims."[33] This court, however, has addressed the merits of a defendant's claim when the procedural bar was not raised in the federal district court.[34] Here, the state did not file any briefs during the state habeas proceedings, so it could not have raised the procedural bar in the state courts; the state did not raise the defense in the district court; and it has not done so in this court.[35] This court *may* have discretion to raise the procedural bar issue *sua sponte,*[36] but we decline to do so because Jackson had no notice that procedural bar would be an issue under consideration, and therefore, no reasonable opportunity to argue either that the state court did not reject his claim on an adequate and independent state

---

[33] **Fisher**, 169 F.3d at 300.

[34] **Fisher**, 169 F.3d at 301 ("A state waives a procedural bar defense by failing to raise the defense in the district court."); **Ortega**, 808 F.2d at 408.

[35] Although a "State shall not be deemed to have waived the exhaustion requirement . . . unless the State, through counsel, expressly waives the requirement," 28 U.S.C. § 2254(b)(3), the exhaustion requirement is related but distinct from that of procedural default. **O'Sullivan v. Boerckel**, 119 S.Ct. 1728 (1999) (Stevens, J., dissenting).

[36] **Fisher**, 169 F.3d at 301.

law ground, or that one of the exceptions to the doctrine applied.[37]

Right to Remain Silent

Jackson contends that the state impermissibly commented on the exercise of his right to remain silent when the prosecutor stated: "Look at him; he hasn't shown any remorse." If the challenged prosecutorial conduct implicates a specific guarantee of the Bill of Rights, the appropriate inquiry on habeas review is whether the prosecutor's statement so prejudiced the specific right as to amount to a denial of that right.[38] For there to have been a denial of one's fifth amendment right to remain silent, the prosecutor's manifest intent in making the remark must have been to comment on the defendant's silence, or the character of the remark must have been such that the jury would naturally and necessarily construe it as a comment on the defendant's silence.[39] To expound on the first inquiry, the prosecutor's intent is not manifestly impermissible if there is some other, equally plausible explanation for the remark. For the second inquiry, the question is not whether the jury might or probably would view the challenged remark in this manner, but whether it necessarily would have done so.[40]

The state contends that the comment addressed Jackson's behavior at the time of the incident, not his exercise of his right to remain silent during trial.

---

[37] **Id.** at 301-02.

[38] **Donnelly v. DeChristoforo**, 416 U.S. 637, 643 (1974).

[39] **United States v. Grosz**, 76 F.3d 1318 (5th Cir. 1996).

[40] **Id.**

16

Viewed in context, the prosecution's argument was as follows: "Look at him; he hasn't shown any remorse. After he and Clary killed this girl, they went into the beer joint and drank beer and shot pool." The state correctly notes that, though it may not directly or indirectly comment on Jackson's decision not to testify, it may call to the jury's attention the fact that the defense did not rebut evidence offered by the state.[41] The state offered evidence that, after the incident, Jackson drank beer and played pool, and it argued that this behavior reflected a lack of remorse. Jackson has offered nothing to rebut this argument. We cannot conclude that there is no plausible and permissible explanation for the prosecution's comment nor that the jury necessarily viewed this statement as a comment on Jackson's silence.

Due Process

Jackson also complains that he was denied due process because the prosecution vouched for the credibility of Clary, invoked the status of the government as a basis for answering affirmatively the special issue questions, and inflamed the passions and prejudices of the jury. When a claim regarding the impropriety of the prosecution's argument is framed as a violation of due process, the appropriate inquiry is not whether the remarks were undesirable or even universally condemned but, rather, whether the prosecution's comments so infected the trial with unfairness that there is a reasonable probability that the result would

---

[41] **Id.**; **United States v. Bermea**, 30 F.3d 1539 (5th Cir. 1994).

have been different if the proceeding had been conducted properly.[42]  We suspect that there is a reasonable possibility that the prosecution's comments infected the proceedings.[43]  We ultimately conclude, however, that there is not a reasonable probability of a different result.  Jackson therefore is not entitled to relief.

Prosecution's Bolstering of Clary's Credibility

Turning first to the comments about Clary's credibility, Jackson invites our attention to **United States v. Knowles**,[44] and urges its application.  According to this suggested inquiry, a prosecutor improperly vouches for a witness by making explicit assurances of the witness' veracity or by alluding implicitly to information not presented to the jury that supports the witness' testimony.[45]  Even assuming the applicability of the suggested inquiry, Jackson is not entitled to relief.

Jackson maintains that the prosecutor explicitly assured the jury of Clary's veracity by stating: "I don't think I would have been around as long as I have as District Attorney . . . if I went around unreasonably deciding who should live or die"  and "It was after considering all the facts in this case with the decision made that we wanted to get one death penalty for sure in this case, and that's the triggerman."

---

[42] **Darden v. Wainwright**, 477 U.S. 168 (1986); **Foy v. Donnelly**, 959 F.2d 1307 (5ᵗʰ Cir. 1992).

[43] **Strickler**, 119 S. Ct. at 1953 (noting that "reasonable probability" presents a higher standard than does "reasonable possibility").

[44] 66 F.3d 1146 (11ᵗʰ Cir. 1995).

[45] **Id.** at 1161.

18

First, these comments do not mention Clary explicitly. Second, in supplementing his argument, Jackson again places unwarranted emphasis on the prosecution's comments that he was the triggerman. Evidence other than Clary's testimony supported an affirmative response to the special issue concerning deliberate conduct; the preceding discussion and analysis undermine Jackson's contentions.[46] Third, we note that Jackson directs his claim to the *penalty* phase of the trial, but each of the comments was made by the prosecution in its closing argument during the *guilt* phase of the trial. Fourth, defense counsel raised the issue that it is the prosecution who makes the determination of who, if anyone, should be prosecuted for a capital crime.[47] Thus, even if the prosecutor's comments somehow gave credence to Clary's testimony or placed the official imprimatur of the government on his credibility, the impact was minimal and certainly not sufficient to undermine confidence in the jury's responses to the special issue

---

[46] Although the preceding discussion and analysis arose in the context of a **Brady** claim, we believe it pertinent here. Both **Brady** claims and this claim find their constitutional footing in the due process clause. In this case, both involve the same question: whether there is a reasonable probability of a different outcome in light of the State's improper conduct. And finally, both involve the credibility assessment of a witness. For a **Brady** claim involving impeachment evidence, the risk is that the jury overestimated a witness' credibility because the jury was denied evidence that would undercut that witness' credibility. For the claim now presented by Jackson, the risk is that the jury overestimated Clary's credibility because the State impermissibly bolstered his credibility.

[47] Trial Transcript, Vol. 27 at 1015-16 ("Mr. Clary is not going to be judged for his life; Mr. Jackson is. . . . I don't think that's fair . . . because who gets the right to select who might live and who might die? Do you? No, you don't. . . . Does the Williamson County grand jury? No. The District Attorney's Office does, that's who gets to select.") (closing argument by defense counsel during guilt phase of the trial).

questions.[48]  Fifth, Jackson did not object to these comments so, wholly apart from the issue of procedural default, the comments presumptively had no substantial adverse impact.[49]

Jackson contends that the prosecution implicitly vouched for Clary's credibility by referring to information not presented at trial: "And this plea bargain was presented to you, it has been testified that there was a part that was not admitted, that you cannot see and is not admissible.  That was part of the plea bargain, and James Otis Clary said that part of the plea bargain was an important factor in him deciding to finally tell the truth."

Although the admission of a plea bargain whereby a witness agrees to testify truthfully or be subject to prosecution does not impermissibly bolster that witness' credibility,[50] Jackson complains of the prosecution's allusion to a portion of the plea bargain that was not admitted.[51] The State concedes error to the extent that the comment contained personal opinion, invoked the prosecutor's personal status as the government's attorney, or implied special knowledge of the unadmitted portion

---

[48] **Darden**, 477 U.S. at 182 (not excusing a prosecutorial response that was improper even though invited by the defense, but noting that, because the response was invited, its impact was lessened); **King v. Puckett**, 1 F.3d 280, 286 (5th Cir. 1993) (denying habeas relief despite comments by the prosecutor during sentencing, such as "I deal with criminal cases every week . . . [and]  I don't ask for the death penalty in every case").

[49] **Derden v. McNeel**, 978 F.2d 1453 (5th Cir. 1992).
Jackson also contends that the State's comments improperly invoke the status of the government itself as a basis for imposing the death sentence.  This claim fails for the reasons just discussed.

[50] **United States v. Edelman**, 873 F.2d 791, 795 (5th Cir. 1989).

[51] The portion of the plea bargain that was not presented to the jury concerned a requirement that Clary submit to a polygraph examination.

of the plea agreement.[52]   It is not enough, however, that a prosecutor's remarks were undesirable or even universally condemned,[53] because the inquiry is whether there is a reasonable probability that, but for the comments, the outcome of the proceeding would have been different.

The evidence speaking to the deliberate nature of Jackson's actions has been discussed.  Evidence also spoke to the probability that Jackson would commit criminal acts of violence that constituted a continuing threat to society.  Jackson was convicted of an armed bank robbery that occurred in January 1977.  After being paroled from that conviction, Jackson was convicted of auto burglary in 1981and received a sentence of four years.  The state offered evidence that during the week in which the capital crime was committed, Jackson bounced a check when purchasing jewelry.  Further, even if not the triggerman, Jackson was involved in the commission of capital murder. Given the persuasive and abundant evidence establishing that Jackson acted deliberately and that he posed a threat of future dangerousness, there is no reasonable probability that, but for the comments, the outcome of the proceeding would have been different.

Prosecution's Emotional Pleas

Jackson also contends that the prosecution impermissibly made emotional pleas to the jury's passion and prejudice.  Jackson complains of comments, such as "[Y]ou have a stake in the community, set [a high] price [for] this particular

---

[52] **Bermea**, 30 F.3d at 1563-64.

[53] **Darden**, 477 U.S. at 181.

21

crime"; "[T]ell Tommy Ray Jackson and the likes of him that you're not going to tolerate those sorts of people and these sorts of acts"; and "[Jackson] will probably commit criminal acts of violence that [will] threaten you and everyone else".

Although the prosecution may not appeal to the jury's passions and prejudices, the prosecution may appeal to the jury to act as the conscience of the community.[54] Additionally, during the penalty phase the prosecution may emphasize the importance of deterrence.[55] Further, the prosecution may impress upon the jury the seriousness of the charges.[56]

Of the remarks about which Jackson complains, only the manner in which the prosecutor personalized the future threat that Jackson might pose to the jurors might have inflamed their passions and prejudices. Previously, however, on direct review we upheld a conviction in which the prosecutor placed the jurors in the positions of victims in order to explain a particularly complicated concept.[57] Here, the contested comment arose within the context of the prosecution's argument addressing the second special issue – the future dangerousness that Jackson would pose to society. Future dangerousness can be a difficult concept.[58] No conclusion

---

[54] **United States v. Phillips**, 664 F.2d 971 (5th Cir. Unit B Dec. 1981).

[55] **King**, 1 F.3d at 286 (denying habeas relief despite comment by prosecutor during sentencing phase: "I want this country to know that we're not going to tolerate [those who commit capital crimes]").

[56] **United States v. Robichaux**, 995 F.2d 565 (5th Cir.1993).

[57] **Robichaux**, 995 F.2d at 570.

[58] **Jurek v. Texas**, 428 U.S. 262, 274 (1976) ("It is, of course, not easy to predict future behavior.").

need be reached on this tangential matter, however, because relief is not warranted as these comments alone do not result in a reasonable probability that the outcome would have been different if the proceeding had been conducted without them.[59]

III.    Improper Admission of an Unadjudicated Offense Claim

Finally, Jackson contends that his sentence was rendered fundamentally unfair and unreliable by the admission of evidence of an unadjudicated offense allegedly committed by him. The evidence concerned a crime committed for which Jackson had not been convicted, charged, or arrested. During the penalty phase, Wilbur Wood testified that, during September 1981, two individuals who wore paper sacks over their heads and who were armed with shotguns burgled his home, located south of Luling, Texas. During this incident, a shotgun was placed against the head of Woods' ten-year old son and his family was herded into a closet before a shot was fired into the wall above the closet door. Several of the Woods' possessions, including firearms, jewelry, and portable televisions, were stolen. Also during the penalty phase, Jackson's cousin, who had been convicted of the theft of some of the Woods' property, testified that he, Jackson, and another individual burgled a home near Luling during September 1981. During this burglary, Jackson and the third party wore pillow cases over their heads, and Jackson carried a shotgun. Though Jackson's cousin could not recall whether

---

[59] Jackson also contends that the cumulative effect of the alleged errors comprising the first two issues merits relief. The cumulative error doctrine provides relief only when the constitutional errors committed in the state court trial so fatally infected the trial that they violated the trial's fundamental fairness. **Spence**, 80 F.3d at 1000. The individual errors did not merit relief, nor can we conclude that the cumulative effect of the alleged errors fatally infected the fundamental fairness of the trial.

23

anyone was home at the time, he was only briefly in the house. Firearms, jewelry, and a television were stolen. Jackson later was convicted of an auto burglary. Two of the firearms stolen from the Woods' home were found at that scene.

Jackson recognizes that circuit precedent allows for the admission of unadjudicated offenses in death penalty proceedings without violating due process, equal protection, or the eighth amendment.[60] Jackson contends, however, that this precedent establishes "standards of relevance and sufficiency of proof"[61] that must be met before unadjudicated offenses may be admitted during the penalty phase of a capital trial, and that these standards were not met here. The state habeas courts[62] and our district court rejected Jackson's contention.

In habeas actions, we do not sit to review the admissibility of evidence under state law unless erroneous evidentiary rulings were so extreme as to result in a denial of a constitutionally fair proceeding. Thus, the erroneous admission of prejudicial testimony does not justify habeas relief unless the evidence played a "crucial, critical, and highly significant" role in the jury's determination.[63] The testimony concerning the burglary of the Woods' home addressed the special issue of future dangerousness. In addition to the disputed testimony, other evidence was

---

[60] **Williams v. Lynaugh**, 814 F.2d 205 (5th Cir. 1987); **Milton v. Procunier**, 744 F.2d 1091 (5th Cir. 1984).

[61] **Williams**, 814 F.2d at 208; **Milton**, 744 F.2d at 1097.

[62] In rejecting Jackson's contention, the state habeas trial court employed the same boilerplate language quoted above, *supra* page ___ n. 29. As before, we do not treat such disposition as "on the merits" for purposes of the AEDPA.

[63] **Little v. Johnson**, 162 F.3d 855, 862 (5th Cir. 1998), *cert. denied*, 119 S. Ct. 1768 (1999); **Milton**, 744 F.2d at 1097.

24

presented concerning whether there was a probability that Jackson would commit criminal acts of violence that would constitute a continuing threat to society, including evidence of Jackson's prior convictions for bank robbery, auto burglary, and now capital murder, and the fact that he was on parole when each act was committed. Therefore the Woods burglary testimony was not "crucial, critical, or highly significant" to the jury's affirmative response to the future dangerousness issue. Accordingly, no relief is warranted.

Jackson also contends that the admission of Woods' victim impact statement exceeds that permitted by **Payne v. Tennessee**.[64] In **Payne**, the Supreme Court determined that, during the penalty phase of a capital trial, the states may allow for the admission and argument of human cost or impact of the crime of which the defendant stands convicted.[65] Jackson contends that the Supreme Court's rationale does not extend to crimes other the capital crime itself. Jackson directs this court to no testimony in particular that he considers to be victim impact statements. Even as described by Jackson, Woods' testimony concerned the factual circumstances surrounding the burglary, not personal characteristics about the victims,[66] and certainly not the impact of the crime upon the victims. Accordingly, Jackson's contention must be rejected.

## CONCLUSION

---

[64] 501 U.S. 808 (1991).

[65] **Id.** at 827.

[66] **Cantu v. State**, 939 S.W.2d 627, 637 (Tex. Crim. App.) ("victim's good nature, hobbies, and work ethic"), *cert. denied*, 118 S. Ct. 557 (1997).

25

For the foregoing reasons, the district court's judgment denying Jackson's petition for habeas relief is AFFIRMED.