IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

October 22, 2008

Charles R. Fulbruge III
Clerk

No. 07-70031

NELSON GONGORA,

Petitioner-Appellant,

v.

NATHANIEL QUARTERMAN, Director, Texas
Department of Criminal Justice, Correctional Institutions Division,

Respondent-Appellee.

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 4:06-CV-836

Before HIGGINBOTHAM, STEWART, and OWEN, Circuit Judges.

PER CURIAM:[*]

Petitioner-Appellant, Nelson Gongora, appeals from the district court's denial of his application for a certificate of appealability ("COA"). Gongora requests a COA from this court on two issues: (1) whether he is entitled to federal habeas relief because the prosecutor commented on his failure to testify during the prosecutor's closing argument, and (2) whether he could be sentenced to death based on the jury's finding that he was able to anticipate that death might

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

result from his participation in the robbery in light of the Supreme Court's decision in Tison v. Arizona, 481 U.S. 137 (1987). For the following reasons, Gongora's application for COA is granted on both issues.

<u>Factual and Procedural Background</u>

Petitioner was tried and convicted in Texas state court for capital murder. The Texas Court of Criminal Appeals ("TCCA") summarized the facts underlying the capital murder trial as follows:

> On the night of April 7, 2001, Juan Vargas was driving his van accompanied by Gongora, Carlos Almanza, Albert Orosco, Steven Gongora, and James Luedtke when they saw Delfino Sierra walking down the street and decided to rob him. When Vargas pulled over, Gongora and Orosco jumped out of the van, ran toward Sierra, and demanded his money. When Sierra began to run, Gongora shot him in the head with a .38 caliber handgun. Gongora and Orosco then returned to the van. Gongora told his companions that he "took [Sierra's] dreams" and did "what [he] had to do" and warned them to remain silent. Gongora appeared to be bragging about what he had done. The group then returned to Gongora's house for a cookout.

> Gongora and Vargas were leaders in the criminal street gang Puro Li'l Mafia ("PLM"). Approximately two hours after Gongora killed Sierra, Vargas drove Gongora and Almanza to the house of a rival gang member. Almanza, in order to become a PLM member, shot into the house in retaliation for drive-by shootings that had occurred at Gongora's house. During the shooting, Gongora stood outside the van armed with a nine-millimeter handgun. The victim of this shooting survived.

> Several days later, an anonymous phone call helped establish that Vargas and Maria Morales owned the suspect van. Vargas was arrested on April 27, and gave a written statement to police naming Almanza as Sierra's killer. On May 9, Vargas met with Detective Carlos Ortega to correct the falsehoods in his first statement and identified Gongora as the shooter. Vargas explained that he had initially lied because he feared retaliation from Gongora.

> On June 19, after he was arrested pursuant to a warrant, Gongora waived his rights and gave a voluntary signed statement. In his statement, Gongora admitted getting out of the van with others to rob Sierra. Then he heard shots and saw the man lying on the ground, but claimed not to know who fired the shots.

Gongora v. State, 2006 WL 234987, * 1 (Feb. 1, 2006).

On March 27, 2003, Gongora was convicted of capital murder by a jury for his involvement in the robbery and murder of Sierra. Based on the jury's answers to the special issues, Gongora was sentenced to death. The TCCA affirmed his conviction on February 1, 2006. Gongora filed a writ of habeas corpus in state court, which was denied on November 15, 2006. Gongora timely petitioned the United States Supreme Court for writ of certiorari; the writ was denied on October 2, 2006.

Gongora initiated federal habeas proceedings on February 28, 2007. The district court considered, inter alia, whether Gongora's constitutional rights were violated when the prosecutor commented on his failure to testify during closing arguments, and whether Gongora's constitutional rights were violated by being subjected to the death penalty because he was able to anticipate that death might result from his participation in the robbery. The court denied Gongora's habeas petition on July 30, 2007, finding that although the prosecutor's remarks regarding Gongora's failure to testify amounted to constitutional error, Gongora had failed to show that the remarks caused him harm. The court also noted that the trial court instructed the jury that Gongora's decision not to testify was not to be "considered as a circumstance against him" both before and after the prosecutor's closing argument. The court then concluded that this claim was without merit. Regarding Gongora's claim that the imposition of the death penalty was unconstitutional because the jury never made a finding of culpability other than that Gongora anticipated that a life would be taken during the course of the robbery, the district court concluded that this claim was also

without merit. Specifically, the court found that the jury instruction permitting conviction of capital murder and a sentence of death based on the anticipation of a murder was sufficient to meet Gongora's constitutional rights.

On August 15, 2007, the district court denied Gongora's request for a COA. Gongora timely filed his appeal, requesting a COA from this court.

### Discussion

Under the Antiterrorism and Effective Death Penalty Act ("AEDPA"), "[b]efore an appeal may be entertained, a petitioner must first seek and obtain a COA." Miller-El v. Cockrell, 537 U.S. 322, 335 (2003); see also 28 U.S.C. § 2253(c). A COA will issue only if the petitioner makes "a substantial showing of the denial of a constitutional right." Id. at 323 (citing § 2253(c)(2)). To satisfy this standard, the petitioner must demonstrate "that jurists of reason could disagree with the district court's resolution of his case or that the issues presented were adequate to deserve encouragement to proceed further." The "threshold [COA] inquiry does not require full consideration of the factual or legal bases adduced in support of the claims." Id. at 336. In fact, "[w]hen a court of appeals sidesteps this process by first deciding the merits of an appeal, and then justifying its denial of a COA based on its adjudication of the actual merits, it is in essence deciding an appeal without jurisdiction." Id. at 336-37. Thus, when determining whether to grant a COA, the question is not whether the petitioner will prevail. Rather, the question is whether the petitioner has "demonstrate[d] that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." Id. at 323-24.

In making a COA inquiry, this court must take into account that in ruling on the merits, the district court was required by AEDPA to defer to the state court's resolution of Gongora's claims, except in limited circumstances. Foster v. Quarterman, 466 F.3d 359, 365 (5th Cir. 2006), cert. denied, 127 S.Ct. 2099 (2007). This deference is required for questions of fact as well as mixed

questions of law and fact, and unless the federal habeas court finds that the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," it may not grant relief. 28 U.S.C. § 2254(d)(1). The factual findings of the state habeas court are to be given deference unless they are "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2).

## I.     Prosecutorial Misconduct– Improper Jury Argument

The "Fifth Amendment, in its direct application to the Federal Government and in its bearing on the States by reason of the Fourteenth Amendment, forbids either comment by the prosecution on the accused's silence or instructions by the court that such silence is evidence of guilt." Griffin v. California, 380 U.S. 609, 615 (1965). "For there to have been a denial of one's fifth amendment [sic] right to remain silent, the prosecutor's manifest intent in making the remark must have been to comment on the defendant's silence, or the character of the remark must have been such that the jury would naturally and necessarily construe it as a comment on the defendant's silence." Jackson v. Jackson, 194 F.3d 641, 652 (5th Cir. 1999)(citation omitted). Even if the prosecutor's comments constitute constitutional error, to obtain habeas relief, a petitioner must show that the error "has substantial and injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619 (1993) (citation omitted) (holding that the "substantial and injurious effect" standard for determining harm applies in the habeas context rather than the "harmless beyond a reasonable doubt" standard).

After reviewing the numerous statements made by the prosecutor during his closing argument regarding Gongora's failure to testify,[1] the district court

---

[1] During the prosecutor's closing argument, he made the following comments regarding Gongora's failure to testify:

concluded that the comments constituted constitutional error because the prosecutor intended to comment on Gongora's silence, and that "the character of the comments was such that a reasonable jury would necessarily construe them as comments on Gongora's silence." Nevertheless, the district court explained that "although the court is extremely disappointed in the prosecutor's remarks, the court simply cannot find any evidence in the record that his remarks 'had substantial and injurious effect or influence in determining the jury's verdict' as required for the granting of federal habeas relief." See Fry v. Pliler, 127 S.Ct. 2321, 2325 (2007). In finding that the error was harmless, the district court relied heavily on the trial court's instructions to the jury advising

---

> You listen to people inside [the van]. Who also would you want to hear from, though? The shooter? We're not going to talk to that person. We're not going to make a deal with that person. This person deserves what they get. This person right here [pointing at Gongora].
>
> Nelson Gongora, the shooter. That's the person on trial. That's the person who deserves to be found guilty of capital murder. Who should we go ahead and talk to? Who should we go ahead and present to you? Should we talk to the shooter. . . .

After two objections by Gongora, the prosecutor attempted to address the error caused by his previous statements, with the following explanation:

> I don't want . . .to make it clear, y'all, Defendant has a Fifth Amendment right not to testify. And, of course - and I don't want to give any wrong impression on that whatsoever. Okay? What I want to talk about is this. When you talk about the credibility of a person, I wish - and I made a - I made a big mistake there. I'll make it very clear. I'm not talking about, do you want to hear from him, because you can't do that.

The prosecutor went on to say:

> When you're considering and evaluating the credibility of the next person and that's who I'm talking about who you're going to hear from. I'm talking about Juan Vargas, there's different people who played different roles. When you consider that we actually spoke to him, that's what I'm talking about. I'm not talking about who would you want to hear from, who would you expect us to call . . .

6

them that the fact that Gongora did not testify could not be considered in resolving his case.

Neither party disputes the district court's finding that the prosecutor's comments constitute constitutional error. Gongora, however, contends that he is entitled to COA because reasonable jurists would find the district court's harm assessment debatable or wrong. Gongora urges that the following show the likely harm as a result of the prosecutor's statements: (1) repeatedly mentioning his decision to remain silent denied him his Fifth Amendment right not to testify; (2) there was significant evidence weighing against a finding that he was the shooter; and (3) during deliberation the jury was primarily concerned with "who was in the van, who got out of the van, and who the jury wanted to hear."

The state responds that because juries are presumed to follow instructions and the trial court sustained each of Gongora's objections, struck the comments from the record, and instructed the jury not to consider the statements, there was no harm to Gongora. The state also posits that the comments were harmless because the evidence that Gongora participated in robbery was overwhelming.

Prosecutorial misconduct is subject to harmless error review. Anderson v. Nelson, 390 U.S. 523 (1968). The Supreme Court has explained that "comment on a defendant's failure to testify cannot be labeled harmless error in a case where such comment is extensive, where an inference of guilt from silence is stressed to the jury as a basis of conviction, and where there is evidence that could have supported acquittal." Id.; see also United States v. Johnston, 127 F.3d 380, 398 (5th Cir. 1997)(citations omitted)("In examining the effect of the prosecutors' impermissible comments, we consider three factors: 'the magnitude of the prejudicial effect of the remark, the efficacy of any cautionary instruction, and the strength of the evidence of the defendant's guilt.'").

As an initial matter, to the extent that Gongora is arguing that the prosecutor's mere mention of his failure to testify constitutes harm, this argument is without merit. The Supreme Court has explicitly rejected the argument that "all federal constitutional errors, regardless of the facts and circumstances, must always be deemed harmful," in favor of harmless error review. Chapman v. California, 386 U.S. 18, 22 (1967).

Nevertheless, a review of the record evidences that the comments made by the prosecutor could have had a substantial and injurious effect on Gongora's defense. First, there was evidence to support Gongora's assertion that he was not the shooter including: (1) the state's primary witness, Juan Vargas, who was the driver of the van on the night in question, initially identified another person as the shooter;[2] (2) state's witness, Sonia Ramos, identified another person as the shooter based on her recollection of the way the assailants were positioned; and (3) in Gongora's own statement admitted into evidence, he denied that he was the shooter. In addition, during deliberations, the jury was concerned with issues that indicate that the prosecutor's comments regarding Gongora's failure to testify may have contributed to his conviction. Specifically, the jury requested photos of the people in the van in jury note one; Juan Vargas's original statement from April 27th as well as his court testimony in jury note three; and the names of the two people Juan Vargas identified as being outside the van in his March 24th statement in jury note five. These notes demonstrate that the prosecutor's comments may have influenced the jury's finding by raising concerns about the testimony regarding who was in the van, and who got out of the van, and Gongora's failure to take the stand to clarify his involvement. Although we acknowledge that the state put on evidence tending to support

---

[2] In his initial statement to the police, as well as in his statement to his wife following the shooting, Vargas indicated that a person other than Gongora was the shooter. Thereafter, when police re-interviewed him, Vargas identified Gongora as the shooter.

Gongora's conviction, we hold that granting COA is appropriate on this issue because reasonable jurists might find the district court conclusion debatable or wrong.

The state urges that the trial court's admonitions to the jury that they disregard the prosecutor's statements mitigate against granting COA. It argues that because jurors are presumed to follow a judge's instructions, Zafiro v. United States, 506 U.S. 534, 540 (1993), the trial court's instructions were sufficient to remedy any harm caused by the prosecutor's statements. However, a curative instruction is not per se sufficient to cure the prejudicial effect of a prosecutor's misconduct. Compare U.S. v. Griffith, 118 F.3d 318, 325 (5th Cir. 1997) (finding error to be harmless where "it was an isolated comment, which did not 'strike at the jugular' of the defense, and which the jury was immediately instructed to disregard.") with Johnston, 127 F.3d at 399 (holding that "[t]he prejudice resulting from a direct reference by a prosecutor to the exercise of [the constitutional right of a defendant to choose not to testify], coupled with an attempt to use the failure to testify to limit the jurors' personal deliberative process cannot be completely cured by a court instruction.").

II.    Tison Discussion

Regarding his second point of error, Gongora argues that the second special issue given to the jury during the punishment stage is unconstitutional in view of the United States Supreme Court's decision in Tison. In particular, he argues that merely finding that he anticipated death is not enough to warrant the death penalty. Instead, he contends, it was necessary for the jury to find that he was a substantial participant in the robbery and that he acted with reckless indifference to human life or that he himself committed the murder.

The state argues that the district court correctly determined that the jury's finding that Gongora anticipated the death of Sierra is sufficient to meet the culpability threshold of "reckless indifference to human life" under Tison.

9

However, the state and the district court only partially address what Gongora appears to be arguing in his briefs, as they do not address his argument that the jury did not make a finding of major participation as required by Tison.

The Tison decision was preceded by the Supreme Court's decision in Enmund v. Florida, 458 U.S. 782 (1982). Both cases involved the imposition of the death penalty in felony murder cases where it had not been proven that the defendant intended to kill. In Enmund, the Court held that the death penalty could not be imposed upon a defendant who, though involved in a felony, did not kill, attempt to kill, intend that a killing take place, or anticipate that lethal force would be used. 458 U.S. at 798. In Tison, the court qualified its holding in Edmund, stating that the Eighth Amendment did not prohibit execution of a felony murder defendant, who did not kill or attempt to kill, if the jury finds that: (1) the defendant was a major participant in the felony committed; and (2) the defendant demonstrated reckless indifference for human life. 481 U.S. at 150.

Gongora alleges that the second special issue given to the jury during the punishment stage is unconstitutional in light of the Tison decision. The second special issue states that in cases where the jury is charged under Section 7.01or 7.02 of the Texas Penal Code during the guilt/innocence stage of the trial, during the punishment stage the jury must determine "whether the defendant actually caused the death of the deceased or did not actually cause the death of the deceased but intended to kill the deceased or another or anticipated that a human life would be taken."[3] TEX. CODE. CRIM. PROC. art. 37.071, § 2(b)(2).

---

[3] In total, the court presented the jury with three issues during the punishment phase, which determined whether Gongora would be sentenced to death or life in prison. The other two issues are: (1) "whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society," TEX. CODE CRIM. PROC. art.37.071, § 2(b)(1); and (2) whether anything in the "the defendant's background or character or the circumstances of the offense that militates for or mitigates against the imposition of the death penalty," TEX. CODE CRIM. PROC. art. 37.071, § 2(d)(1).

Gongora argues that the phrase "or anticipated human life would be taken" renders the second special issue unconstitutional because (1) the issue does not require the jury to find that the defendant was a substantial participant in the felony, and (2) it is unclear whether "anticipated human life would be taken" amounts to reckless indifference as required by Tison.

In overruling Gongora's challenge to the second special issue, the TCCA relied on Cantu v. State, 939 S.W.2d 627 (Tex. Crim. App. 1996). In that case, the court was faced with essentially the same issue: whether the second special issue was facially unconstitutional in violation of Tison because it does not require the jury to make a finding of culpability. The majority held that because the jury was charged at the guilt/innocence stage that they could not find the defendant guilty of capital murder unless he intentionally murdered the victim or intentionally assisted in the commission of the murder and the aggravating offense, "[f]or purposes of the Eighth Amendment . . . there was no need for further factfinding at the punishment phase of trial."

Gongora, relying on the reasoning of the dissenting justices in his state habeas proceedings, see Gongora v. State, 2006 WL 234987, *12, argues that his case is distinguishable from Cantu because unlike in that case, here additional fact-finding was required as the instructions given at the guilt/innocence stage did not satisfy Enmund/Tison. We therefore look to the instructions given during the guilt/innocence phase to determine whether they were sufficient to satisfy the requirements set forth in Tison.

Here, during the guilt/innocence stage of the trial, the jury was given the following instructions:

> Now, therefore, if you believe from the evidence beyond a reasonable doubt, that the Defendant, Nelson Gongora, . . . did . . . intentionally cause the death of an individual, Delfino Sierra, by shooting Delfino Sierra with a deadly weapon, to-wit: a firearm, and that said

11

> Defendant was . . . in the course of committing or attempting to commit the offense of robbery of Delfino Sierra, or if you find and believe from the evidence beyond a reasonable doubt, that the Defendant, Nelson Gongora, entered into a conspiracy with Albert Orosco to commit the felony offense of robbery of Delfino Sierra and that . . . in the attempt to carry out this conspiracy, Albert Orosco did then and there intentionally cause the death of an individual, Delfino Sierra, by shooting Delfino Sierra with a deadly weapon, to-wit: a firearm, and that such offense was a felony committed in furtherance of the unlawful purpose to commit robbery of Delfino Sierra and was an offense that should have been anticipated by the Defendant as a result of carrying out the conspiracy, then you will find the Defendant guilty of capital murder, though he may have no intent to commit capital murder, as charged in the Indictment.

Based on these instructions, the jury then returned a verdict of guilty.

Here, unlike in Cantu, we cannot conclude that these instructions are necessarily sufficient to meet the Tison requirements, and the state does not articulate in its briefs to this court how these instructions could be construed to satisfy the requisite finding of major participation and reckless indifference to human life. As such, Cantu is not persuasive on the facts of this case. Moreover, we believe that a reasonable jurist could find the district court's determination that the second special issue as presented during the guilt/innocence phase of Gongora's trial satisfies the Tison requirement is debatable or wrong. Accordingly, we grant Gongora COA on this issue.[4]

---

[4] Gongora also argues that in light of Apprendi v. New Jersey, 530 U.S. 466 (2000), and Ring v. Arizona, 536 U.S. 584 (2002), it was error for the TCCA to find that he murdered Sierra, and that this determination may not be considered in this court's resolution of his Tison claim. Thus, also important to the resolution of this claim is whether Apprendi and Ring are applicable, i.e., whether a jury, rather than a judge, must make the factual determinations under Tison. This court has yet to consider this issue. In Foster v. Quarterman, 466 F.3d 359 (5th Cir. 2006), this court considered whether the requisite Tison findings had been made but refused to make a definitive determination as to whether Apprendi and Ring were applicable, noting that those cases were decided after the Supreme Court denied review from the

## Conclusion

For the foregoing reasons, we grant a COA with regard to Gongora's prosecutorial misconduct and Tison claims.

COA GRANTED.

---

defendant's direct appeal, and therefore even if they were applicable, they did not apply retroactively. Id. at 369-70. The Foster court went on to consider whether any state court had made the required Tison findings, rather than limiting their review to determining whether the jury had made them. Id. at 370; see also Clark v. Johnson, 227 F.3d 273, 281 (5th Cir. 2000), cert. denied, 531 U.S. 1167 (2001) (pre-Ring case holding that a reviewing court could examine the entire state record to determine whether any state court had made the requisite Tison findings). We express no opinion as to the applicability of Apprendi and Ring to the resolution of this case.