# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

February 27, 2013

No. 07-70031

Lyle W. Cayce
Clerk

NELSON GONGORA,

Petitioner - Appellant

v.

RICK THALER, DIRECTOR, TEXAS DEPARTMENT OF CRIMINAL
JUSTICE, CORRECTIONAL INSTITUTIONS DIVISION,

Respondent - Appellee

Appeal from the United States District Court
for the Northern District of Texas

Before STEWART, Chief Judge, and HIGGINBOTHAM and OWEN, Circuit
Judges.

PER CURIAM:

Nelson Gongora was convicted in Texas state court for capital murder and sentenced to death. After the state court denied habeas relief, Gongora petitioned the district court for relief under 28 U.S.C. § 2254, requesting that his conviction and sentence be set aside and a new trial ordered. The district court denied relief. We granted a certificate of appealability (COA) on two issues: (1) whether Gonogra is entitled to habeas relief because the prosecutor commented during his closing argument on Gongora's failure to testify; and (2) whether, in

No. 07-70031

light of the Supreme Court's holding in *Tison v. Arizona*,[1] Gongora could be sentenced to death based on a jury finding that he anticipated murder would result from his participation in robbery of the victim.[2] We find that the extraordinarily extensive comments on Gongora's failure to testify resulted in actual prejudice, and we GRANT Gongora's habeas petition and vacate his conviction.

## I.

Texas charged Nelson Gongora with capital murder for the killing of Delfino Sierra during the course of a robbery. Although the indictment charged that Gongora shot Sierra, at trial, the State sought to convict Gongora either as the shooter or under the alternate theory that Gongora was a participant in a robbery in the course of which Sierra was murdered by one of Gongora's co-defendants, Albert Orosco. The jury heard sharply conflicting evidence regarding Gongora's role in the offense, including evidence that the shooter may have been someone other than either Gongora or Orosco.

The State's first witness, Sonia Ramos, told the jury that she was driving on the night of April 7, 2001 when she noticed three Hispanic men walking on the side of the road; the man in the middle (Sierra) had on a cowboy hat. As she turned to look toward a friend's house, she saw the man on the left shoot Sierra. She then looked back, and saw a van parked in a driveway with its reverse lights on. The man who had been on the right side of Sierra ran "like he was running towards the van," and the man who shot Sierra "kind of backed up" and "kind of

---

[1] 481 U.S. 137 (1987).

[2] *Gongora v. Quarterman*, No. 07-70031, 2008 WL 4656992, at *1 (5th Cir. Oct. 22, 2008) (*Gongora IV*).

looking to what he had done . . . then turned around like to go towards the van." Ramos could not see the mens' faces.

Juan Vargas was the State's next witness. Vargas also had been indicted for Sierra's murder. Vargas admitted that he was the driver of the van. Arrested about three weeks after Sierra's shooting, he gave a sworn, written statement to police identifying James Luedtke and Carlos Almanza as the two who had emerged from the van to rob Sierra and identifying Almanza as Sierra's shooter. Police interviewed him again a few weeks later. This time, Vargas identified Gongora as the shooter. He said that it was in fact Gongora and Orosco, and not Almanza and Luedke, who had approached Sierra. At trial, Vargas testified that he had initially lied to the police when he identified Almanza and Luedtke because he feared retaliation from Gongora. But that fear was apparently soothed by his plea agreement. Under that agreement, in exchange for pleading guilty and testifying against Gongora, Vargas would receive a twenty-three year sentence for Sierra's murder and not be prosecuted at all for a second shooting.

With plea agreement in hand, Vargas testified that on the night of April 7, 2001, he was driving his van accompanied by Gongora, Almanza, Albert Orosco, Steven Gongora ("Steven"), and Luedtke ("Guero") when they saw Sierra walking down the street and decided to rob him. Gongora, Almanza, and Vargas had all taken heroin earlier in the evening. Vargas told the jury that when he pulled over, Gongora and Orosco jumped out of the van, ran toward Sierra, and demanded his money. When Sierra began to run, Gongora shot him in the head with a .38 caliber handgun that belonged to Vargas. Vargas said he had given the gun to Gongora earlier in the night for protection. Gongora and Orosco then returned to the van. Vargas asked what Gongora did, and Gongora said "I had to do what I had to do" and told everyone to remain silent. The group then returned to Gongora's house for a cookout.

No. 07-70031

Vargas and Gongora were leaders in the criminal street gang Puro Li'l Mafia (PLM). Vargas testified that about two and a half hours after Sierra's shooting, Almanza became a member of PLM by doing a drive-by shooting. Vargas was the driver for that shooting, and Gongora was in the van as well. Vargas testified that the shooting by Almanza was in retaliation for drive-by shootings at Gongora's house. During the shooting, Gongora stood outside the van armed with a nine-millimeter handgun. The victim of this shooting survived. Vargas admitted that he was high on heroin and intoxicated with beer at the time of both shootings and that this impaired his ability to recall how things happened.

Several months after Vargas revised his account of Sierra's shooting, police interviewed Dylan Griffith, who met with the group in Vargas's van after Sierra's shooting. At trial, Griffith, a defense witness, testified that when Vargas's van pulled up Vargas was yelling at somebody, apparently Orosco, "because they were having a conflict over something." When Orosco emerged from the van, he had a .38 in his waistband and was bragging about killing someone, saying, "I shot some wet back." Griffith asked why Orosco did that and Orosco said they had tried to rob the person. Griffith then asked what they got from the robbery and Orosco said, "Nothing. I done took his soul and his dreams. That's all I want."

After Griffith was first interviewed by the police, he got in touch with James Luedtke ("Guero") and told him the police were trying to locate "Guero." Luedtke asked what the police wanted and Griffith said they just wanted a statement of what happened. Griffith testified that Luedtke then said, "So all I got to do is write down Albert shot him?" Griffith said, yes, if that was what happened, and Luedtke said: "I ain't — I ain't going down for it. I'll put it on whoever I got to, as long as I don't go down for it." Luedtke seemed frightened of being arrested.

4

No. 07-70031

At trial, Luedtke was called as a witness for the prosecution. Police officers did not talk to Luedtke until six months before trial. He was scared when he first talked to the investigator, fearing a charge of capital murder. Luedtke told police and later testified that Orosco had said "Let's get this guy," and that Gongora and Orosco then approached the man and Gongora "told him pretty much 'casa la febio,'" which, according to Luedtke, meant "Give me your money." Luedtke stated that he was in the back — in the third row — of the van when this happened, but that he was able to hear because the side windows of the van were down. Luedtke testified that he saw Gongora pull a gun, and that when Orosco and Gongora returned to the car, Gongora said "I took his dreams," apparently bragging. Gongora also said: "Nobody say nothing. Nobody seen nothing. Nobody heard nothing." Luedtke said that Gongora and Orosco were behind the victim and Gongora was on the right and Orosco on the left. The day of Sierra's shooting, Luedtke had been doing drugs (heroin and pot) and drinking.

Ramiro Enriquez, a defense witness who had been in prison with Vargas and Almanza, testified that Almanza told him that Almanza and two others had gotten out of Vargas's van and approached Sierra, and that Almanza had done the shooting. Almanza told Enriquez that he was standing over the victim and the other two people came up and said something to the effect of "Hey, let's go, go, go."[3]

---

[3] In his previous sworn written statement, Enriquez said was not sure how many people, according to Almanza, got out of the van and crossed the street toward Sierra. However, on cross-examination at trial, the prosecutor elicited that Enriquez had told the prosecutor at some point that it was Carlos and two others. Although the prosecutor phrased a series of questions that made reference to a group of three as about what Enriquez had previously told him Carlos said, he then followed up with a question: "And this is what you swear Carlos told you?" To which Enriquez responded, "Yes." On re-direct, the defense elicited that Enriquez actually still was not sure about the number of people Carlos had indicated approached Sierra.

No. 07-70031

The jury also learned of Gongora's written statement, which he gave after he was arrested about two-and-a-half months after Sierra's murder.   He wrote:

> We passed [Sierra] up and pulled into a little store before [Sierra] passed the railroad tracks.  We did a U-turn in the parking lot and went back towards the guy was walking. . . . All we wanted to do is get a little money and go about our business.   Next thing I remember, the side door opened, all of us . . . were going to get out. Then there were gunshots.  I turned around and saw the guy that was wearing the cowboy hat laying on the ground.  I think there was about three fast shots fired.  Right after the shots, all of us jumped back in the van and we left.

Gongora stated that he did not know who fired the shots.

Both Orosco and Almanza invoked their Fifth Amendment right against self-incrimination and gave no testimony before the jury.

## II.

The trial court instructed the jury that it could convict Gongora if it found the evidence established beyond a reasonable doubt that Gongora shot Sierra during the course of a robbery; *or* that Gongora entered into a conspiracy with Orosco to rob Sierra, that Orosco shot Sierra during the course of that attempted robbery, that the shooting was in furtherance of the conspiracy, and that Gongora should have anticipated the shooting.  The jury found Gongora guilty, and he was ultimately sentenced to death. The CCA affirmed Gongora's conviction and sentence on direct appeal.[4]  Gongora's state habeas petition was rejected by the state trial court, and the CCA affirmed the trial court's decision.[5]

---

[4] *Gongora v. State*, No. AP-74636, 2006 WL 234987 (Tex. Crim. App. 2006), *cert. denied*, 549 U.S. 860 (2006) (*Gongora I*).

[5] *See Ex parte Gongora*, No. WR-60115-02, 2006 WL 3308713 (Tex. Crim. App. Nov. 15, 2006) (*Gongora II*).

No. 07-70031

In February 2007, Gongora filed the underlying 28 U.S.C. § 2254 petition for a writ of habeas corpus in the district court, claiming that constitutional errors infected both his trial and sentencing proceedings. The district court denied relief,[6] and we granted a COA on two issues: (1) Gongora's claim that comments by the prosecutor during closing argument violated his Fifth Amendment right not to testify and resulted in actual prejudice, and (2) his claim that the imposition of the death penalty in his case would violate his right to due process of law and to be protected from cruel and unusual punishment under the Eighth and Fourteenth Amendments and *Tison v. Arizona*.[7] We ultimately do not reach the second issue.

**III.**

We review Gongora's habeas petition under the deferential standard of review provided in the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). Under 28 U.S.C. § 2254(d), when a habeas claim has been adjudicated on the merits in the state courts, federal habeas relief may not be granted unless the federal habeas court finds that the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court" or was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."[8]

A legal principle is "clearly established" only when it is embodied in a holding of the Supreme Court.[9] For purposes of § 2254(d)(1), a state court

---

[6] *Gongora v. Quarterman*, 498 F. Supp. 2d 919, 931 (N.D. Tex. 2007) (*Gongora III*).

[7] 481 U.S. 137 (1987).

[8] 28 U.S.C. § 2254(d)(1), (2).

[9] *Thaler v. Haynes*, 130 S. Ct. 1171, 1173 (2010).

decision "involves an unreasonable application of th[e] Court's clearly established precedents if the state court applies th[e] Court's precedents to the facts in an objectively unreasonable manner."[10]  The Supreme Court has repeatedly admonished that "an *unreasonable* application of federal law is different from an *incorrect* application of federal law."[11]  Thus, "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly."[12]  "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision."[13]  Within the AEDPA framework, we review the district court's conclusions of law *de novo*.[14]

## IV.

We now turn to Gongora's Fifth Amendment claim.  In *Griffin v. California*, the Supreme Court held that "the Fifth Amendment . . . forbids either comment by the prosecution on the accused's silence or instructions by the court that such silence is evidence of guilt."[15]  The Court has since clarified that

---

[10] *Brown v. Payton*, 544 U.S. 133, 141 (2005) (citing *Williams v. Taylor*, 529 U.S. 362, 405 (2000)).  In contrast, a state court decision is "contrary" to clearly established Court precedent if "it applies a rule that contradicts the governing law set forth in [the Court's] cases, or if it confronts a set of facts that is materially indistinguishable from a decision of th[e] Court but reaches a different result." *Id.*

[11] *Renico v. Lett*, 130 S. Ct. 1855, 1862 (2010) (quoting *Williams*, 529 U.S. at 410).

[12] *Id.* (quoting *Williams*, 529 U.S. at 411).

[13] *Harrington v. Richter*, 131 S. Ct. 770, 786 (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).

[14] *Nelson v. Quarterman*, 472 F.3d 287, 293 (5th Cir. 2006) (en banc).

[15] 380 U.S. 609, 615 (1965).

comment on a defendant's silence is permissible in some instances, as where "the prosecutor's reference to the defendant's opportunity to testify is a fair response to a claim made by defendant or his counsel."[16] But the rule is unchanged that a prosecutor "may not treat a defendant's exercise of his right to remain silent at trial as substantive evidence of guilt."[17] A *Griffin* error is subject to harmless error analysis.[18] On direct appeal, a state court cannot hold harmless a *Griffin* error unless the court is "able to declare a belief that [the violation] was harmless beyond a reasonable doubt."[19]

Our evaluation of a Fifth Amendment claim like Gongora's proceeds in two steps. First, we must decide under 28 U.S.C. § 2254(d)(1) whether fairminded jurists could disagree that a *Griffin* error occurred.[20] We must then decide whether the Fifth Amendment violation was harmless.[21] When a state court on direct appeal has determined under *Chapman* that a *Griffin* error was harmless beyond a reasonable doubt, a petitioner cannot obtain federal habeas relief based merely on a finding, per AEDPA, that no jurist could reasonably conclude that the Fifth Amendment violation was harmless beyond a reasonable doubt. Rather, applying the standard set forth by the Supreme Court in *Brecht v. Abrahamson*,[22] the federal court must determine whether the Fifth Amendment

---

[16] *United States v. Robinson*, 485 U.S. 25, 32 (1988).

[17] *Id.* at 34.

[18] *Chapman v. California*, 386 U.S. 18, 23–25 (1967).

[19] *Id.* at 24; *Fry v. Pliler*, 551 U.S. 112, 116 (2007).

[20] *See Richter*, 131 S. Ct. at 786.

[21] *See Fry*, 551 U.S. at 120.

[22] 507 U.S. 619 (1993).

No. 07-70031

violation "had substantial and injurious effect or influence in determining the jury's verdict."[23]

Here it appears the CCA did not apply *Chapman* and made no finding that any Fifth Amendment violation was harmless beyond a reasonable doubt. Regardless, Gongora must still clear the hurdle of *Brecht*: We "assess the prejudicial impact of [the prosecutor's comments on Gongora's silence] under the 'substantial and injurious effect' standard set forth in *Brecht*, whether or not the state appellate court recognized the error and reviewed it for harmlessness under . . . *Chapman*."[24]

**A.**

During closing argument at the guilt-innocence phase of Gongora's trial, the prosecutor made the following relevant comments (emphasis added):

> [PROSECUTOR:] . . . I want to talk about the people you heard from. . . . Who did you expect us to bring to you? There's six people inside that van. When you look at it, here it is. Who would you expect for us to give to you to establish who the shooter is? Are you going to be satisfied in a case with gang members just looking at one person, even though he's telling you the exact truth, no matter what? Even if the time that he first told this story, he told the truth—he told the truth about someone he's scared to death of—this is James Luedtke. He had nothing against him. He had no crime pending. He had no reason to hide the truth. He had no reason to talk to us, but he told us the truth.

---

[23] *Id.* at 631. In this circuit, the assessment of harmless error under *Brecht* is a mixed question of fact and law, and we thus review the district court's determination *de novo*. *See, e.g.*, *Garcia v. Quarterman*, 454 F.3d 441, 444 (5th Cir. 2006).

[24] *Fry*, 551 U.S. at 121–22. The Supreme Court has explained: "[I]t is implausible that, without saying so, AEDPA replaced the *Brecht* standard of 'actual prejudice' . . . with the more liberal AEDPA/*Chapman* standard which requires only that the state court's harmless-beyond-a-reasonable-doubt determination be unreasonable." *Id.* at 119–20 (citation omitted) (internal quotation marks omitted).

No. 07-70031

You listen to people inside there. *Who else would you want to hear from, though? The shooter? We're not going to talk to that person.* We're not going to make a deal with that person. This person deserves what they get. This person right here—
[Pointing to Gongora's name on a chart.]
*Nelson Gongora, the shooter. That's the person on trial.* That's the person who deserves to be found guilty of capital murder.
*Who should we go ahead and talk to? Who should we go ahead and present to you? Should we talk to the shooter?* Should we talk to—

[DEFENSE COUNSEL:] Your Honor, I'm going to object. That's a comment on the failure to testify.

[PROSECUTOR:] Let me make that clear. I don't mean talk to the shooter. What I mean is this. Who—

Defense counsel then asked for a ruling on the objection, and the trial court sustained it; defense counsel then asked for a curative instruction:

[DEFENSE COUNSEL:] Could we get an instruction to the jury to disregard that comment?

THE COURT: Jury will so disregard.

[DEFENSE COUNSEL:] Move for mistrial, your honor.

THE COURT: Denied.

[PROSECUTOR:] Let me say this. And I don't want to give the wrong impression in any sort of way. We're asking, *who do you expect to take the stand? Who do you expect to hear from*, *right*?

[DEFENSE COUNSEL:] Your Honor, I object. That's a continuation of the previous comments, and I, again, object to commenting on the failure to testify.

The court again sustained Gongora's objection to the prosecutor's comment, granted his request to instruct the jury to disregard the comment, and overruled his motion for a mistrial. The prosecutor continued:

11

No. 07-70031

[PROSECUTOR:] I don't want—to make it clear, y'all, Defendant has a Fifth Amendment right not to testify. And, of course—and I don't want to give any wrong impression on that whatsoever. Okay?

What I want to talk about is this. When you talk about the credibility of a person, I wish you—and I made a—I made a big mistake there. I'll make it very clear. *I'm not talking about, do you want to hear from him, because you can't do that.*

[DEFENSE COUNSEL:] Your Honor, again, I'm going to object. It's on the same continuing subject matter. We object to comment on the failure . . . to testify.

THE COURT: As to that particular statement, overruled.

[PROSECUTOR:] Let me back up and tell you this. Let me define it by the roles in the car. That's what I'm trying to get at. Okay?

The roles in the car are this. . . . And then you have a person inside the car who is the Defendant's brother, right? Where is that person? We know the person was there. They could have brought that person, but you never heard from that person. And that's—

[DEFENSE COUNSEL:] Your Honor, I'm going to object as to what that person is and ask to approach the bench to make a record.

THE COURT: Counsel approach.

(At the bench, on the record:)

[DEFENSE COUNSEL:] I'll be brief.

Judge, our objection is that we issued bench warrants and subpoenas. We asked to have people brought in. They took the Fifth. And when he says "that person," that diagram is still up there showing Albert [Orosco] and everybody else, and that is an improper comment, and it's not invited.

[PROSECUTOR:] Judge, I'm trying to correct that right now to make it better in terms of I'm just talking about the roles of the persons involved.

12

No. 07-70031

THE COURT: All right. Sustain the objection, Counselor.

[PROSECUTOR #2:] Excuse me. Let me make one comment for the record also.

Immediately— what [the prosecutor] was talking about there, so it's clear for the record, was that he mentioned the name "Steven Gongora." He mentioned the name, and he said, "The Defendant's brother." And he said, "Where is that person?"

Steven Gongora is the Defendant's brother, and his name is also on the chart, and that's what he was talking about.

THE COURT: All right. You need to clear it up, Counselor.

[PROSECUTOR:] I will.

Defense counsel then asked if his objection was sustained. The trial court sustained the objection and, on request of defense counsel, instructed the jury to disregard the comment. The trial court then overruled appellant's motion for mistrial. The prosecutor continued:

[THE PROSECUTOR:] Ladies and gentlemen, I want to wrap this up, because that's what I'm talking about, the confusion in the case.

When I—when you're talking about the people inside the car, this is it. You have the person inside the van and, from all the testimony, established one person is the shooter. You have a person in the car who got out and could possibly have stopped the killing from ever taking place. You have a person inside the car, by the testimony, you all know was involved in another shooting later that night. You have a person in the car who was related to the Defendant. That is his brother. Right? Then you have a person inside there who is just present. Okay?

. . .

Those are the different roles of the persons inside the car. You ask who—you know, you hear from this case, and who should—you know, how to determine the credibility. *Who do you want to hear from? Who do you expect to hear from? The person who wasn't*

13

No. 07-70031

*involved at all, that had nothing at all, just present during that deal? Of course, you hear from that person.*

When you're considering and evaluating the credibility of the next person—and that's who I'm talking about in talking about who you're going to hear from. I'm talking about, when listening to Juan Vargas, there's different people who played different roles. When you consider the fact that we actually spoke to him, that's what I'm talking about. I'm not talking about who would you want to hear from, who would you expect us to call, but I meant to define it in the terms of the roles of those involved in the case. Okay?

. . . .

That's what I wanted you to consider. That's what I was trying to discuss about the different roles and *who you would expect to hear from* or expect us, you know, to be looking at. That was it. Just examine their roles.

In its opinion rejecting Gongora's claims on direct appeal, the CCA admitted that "the prosecutor's actual comments tended to be inartful and often confusing," but stated that, "viewed in context, the complained-of comments appear to be the prosecutor's attempt to comment on appellant's failure to produce witnesses other than appellant, which is a permissible area of comment."[25] The CCA concluded that the record showed "the prosecutor's comments were not so blatant that they rendered the instructions to disregard ineffective" and held that "the judge reasonably concluded that the instructions to disregard effectively removed any prejudice caused by the prosecutor's comments."[26]

The federal district court reviewing Gongora's § 2254 petition found that the prosecutor's comments constituted constitutional error because the prosecutor intended to comment on Gongora's silence and that "the character of

---

[25] *Gongora I*, 2006 WL 234987, at *10.

[26] *Id.*

14

the remarks were such that the jury would necessarily construe them as comments on Gongora's silence."[27]   Nonetheless, the district court found the error to be harmless, concluding that "there [was] no evidence . . . of a nexus between the prosecutor's improper remarks during argument and the jury's decisions" and presuming that the jury followed the cautionary and curative instructions given by the trial court.[28]

## B.

### 1.

At the first step of our analysis, we agree with the district court that Gongora has met his burden of showing a constitutional violation.   The prosecutor repeatedly referred to Gongora's failure to testify, and whatever the prosecutor's subjective intent in making the remarks, "the character of the remark[s] [was] such that the jury would naturally and necessarily construe [them] as . . . comment[s] on the defendant's silence."[29]   Indeed, the state no longer maintains that the prosecutor's comments on Gongora's failure to testify did not violate the Fifth Amendment.   To the extent that the CCA reached a contrary conclusion, it unreasonably applied the clearly established federal law of *Griffin* and its progeny.[30]   To conclude otherwise empties all meaning of this cornerstone of rights upon which our criminal justice system rests.   Its very centrality renders it a primer rule — etched in the minds of all players in a criminal case.   Single episodic violations will creep in, but repeated and direct violations are both inexplicable and inexcusable.   Certainly not excusable by ignorance or inexperience, as we will explain.

---

[27] *Gongora III*, 498 F. Supp. 2d at 926.

[28] *Id.* at 927.

[29] *Jackson v. Jackson*, 194 F.3d 641, 652 (5th Cir. 1999) (citation omitted).

[30] *See* 28 U.S.C. § 2254(d)(1).

No. 07-70031

**2.**

At the second step, we assess the prejudicial impact of this constitutional error, applying the standard set forth in *Brecht*. We make this assessment "in light of the record as a whole."[31] As the Supreme Court has explained, the *Brecht* standard does not require the petitioner to establish that it is more likely than not that the constitutional violation resulted in actual prejudice: "When a federal judge in a habeas proceeding is in grave doubt about whether a trial error of federal law had 'substantial and injurious effect or influence in determining the jury's verdict,' that error is not harmless. And, the petitioner must win."[32] Several factors are relevant to this inquiry, including whether the comments were "extensive," whether "an inference of guilt from silence [was] stressed to the jury as a basis for conviction," and whether "there is evidence that could have supported acquittal."[33] We also consider the effect of any cautionary or curative instruction given to the jury.[34] Considering each of these factors, we conclude that the error was not harmless under *Brecht*.[35]

---

[31] *Brecht*, 507 U.S. at 638; *see also United States v. Pierre*, 958 F.2d 1304, 1312 (5th Cir. 1992) (en banc) ("To determine the potential prejudicial effect of the statements, we must consider the context in which the prosecutor made them.").

[32] *O'Neal v. McAninch*, 513 U.S. 432, 436 (1995). The Court has "deliberately phrase[d] the issue in terms of a judge's grave doubt, instead of in terms of 'burden of proof.'" *Id.*

[33] *Anderson v. Nelson*, 390 U.S. 523, 523–24 (1968); *see also United States v. Johnston*, 127 F.3d 380, 398 (5th Cir. 1997) (considering "the magnitude of the prejudicial effect of the remark" and "the strength of the evidence of the defendant's guilt").

[34] *See Johnston*, 127 F.3d at 398 (listing "the efficacy of any cautionary instruction" as a factor to consider in assessing the harmlessness of a prosecutor's improper comments); *see also Greer v. Miller*, 483 U.S. 756, 767 n.8 (1987) (finding "no reason to believe that the jury in [the] case was incapable of obeying . . . curative instructions" given after the introduction of inadmissible evidence).

[35] Where, as here, the state appellate court made no finding under *Chapman*, the Supreme Court has suggested that it "makes no sense to require formal application of both tests (AEDPA/*Chapman* and *Brecht*) when the latter obviously subsumes the former." *Fry*, 551 U.S. at 120. We note, though, that as our *Brecht* analysis implies, the CCA could not have reasonably determined that the error in this case was harmless beyond a reasonable doubt.

a. *Extent of the Comments*

As the district court observed, "the prosecutor's remarks on Gongora's failure to testify were numerous and blatant."[36]  Rather than a single question or incidental statement, the prosecutor made a series of at least five comments referring to Gongora's silence as he argued to the jury that Gongora was the shooter. In the guise of clearing up what his earlier comments meant, the prosecutor continued to make comments relating back to the fact that Gongora had not testified. The judge repeatedly cautioned the prosecutor, yet the prosecutor further highlighted the reference by persisting in his train of "who you would expect to hear from" argument.  This factor weighs against a finding that the error was harmless.

b. *Inference of Guilt Stressed to the Jury*

The prosecutor's initial comment clearly and strenuously — regardless of whether the comments were intentional or inartful — emphasized Gongora's guilt to the jury based on his failure to testify:

> You listen to people inside there. Who else would you want to hear from, though? The shooter? We're not going to talk to that person. . . . This person right here—
>
> [Pointing to Gongora's name on a chart.]
>
> Nelson Gongora, the shooter. That's the person on trial. That's the person who deserves to be found guilty of capital murder. Who should we go ahead and talk to? Who should we go ahead and present to you? Should we talk to the shooter? Should we talk to—

A principal focus of the prosecutor's closing argument, and central to the State's case, was the credibility of co-conspirators' statements that Gongora was the shooter.  It appears as though the prosecutor attempted to bolster the credibility of those statements by repeatedly stressing the fact that some co-conspirators took the stand, while persistently questioning Gongora's claim of not-guilty by

---

[36] *Gongora III*, 498 F. Supp. 2d at 926.

No. 07-70031

reference to his refusal to take the stand. The argument went to the core of the State's case and aggressively prompted the jury to infer guilt based on Gongora's failure to testify. Further, the comments came at the very end of the prosecution's closing arguments.

Examined in context, the prosecution's subsequent comments on Gongora's silence might be read, as the State and the dissent contend, as a product of a prosecutor tripping over his words as he inartfully attempted to correct his initial mistake. But their effect, coming as they did after the prosecutor's initial statement stressing an inference of guilt, was to reinforce the impression of Gongora's guilt from his failure to testify. It also matters not that the prosecutor's later comment merely recited that Gongora "has a Fifth Amendment right not to testify." As we have previously observed, a reference of this sort by the prosecutor "is far different" than a cautionary instruction about a defendant's Fifth Amendment right not to testify given by the court.[37] Even as the prosecutor noted Gongora's Fifth Amendment right, the function of the prosecutor's comment was to "focus[] the jury's attention on the fact that the defendants did not testify."[38] While telling the jury of Gongora's right, he commented on its exercise. This translated into a clear message: Gongora's right not to testify is not a right to be free of the jury weighing the exercise of that right against him.

This factor, too, thus weighs against a finding of harmless error. The Fifth Amendment violation here did not consist of an "isolated comment," and whatever the prosecutor's subjective intent, his manifest purpose was to "strike at the jugular of the defense."[39]

---

[37] *Johnston*, 127 F.3d at 398.

[38] *Id.*

[39] *United States v. Griffith*, 118 F.3d 318, 325 (5th Cir. 1997) (internal quotation marks omitted) (finding that a *Griffin* violation did not affect the defendant's substantial rights

18

No. 07-70031

c. *Curative and Cautionary Instructions*

While the trial court issued general cautionary instructions about the defendant's constitutional right not to testify at voir dire and again immediately before closing argument,[40] the prosecutor's comments followed those instructions. Moreover, although two of the prosecutor's improper remarks were promptly followed by sustained objections and curative instructions, those instructions — telling the jury to "disregard" the comment — were perfunctory and devoid of specificity. Finally, the trial court did not sustain all of Gongora's objections to the improper remarks. Specifically, the court overruled Gongora's objection to the last of the improper comments, in which the prosecutor stated, "I'll make it very clear. I'm not talking about, do you want to hear from him, because you can't do that." While as a general rule, juries are presumed to follow instructions given by the court,[41] neither this court nor the Supreme Court has ever held that the mere fact that a curative or cautionary instruction was offered establishes harmlessness under *Brecht*.[42] Indeed, the Supreme Court has noted that "[t]here are some contexts in which the risk that the jury will not, or

_____

where "it was an isolated comment, which did not 'strike at the jugular' of the defense, and which the jury was immediately instructed to disregard" and the "spontaneous remark [was] intended to call attention to [the defendant's] disruptive behavior during [the prosecutor's] argument, and not to imply that he was harboring guilty secrets").

[40] The court's instruction prior to closing argument read as follows:

In a criminal case the law permits the Defendant to testify in his own behalf but he is not compelled to do so, and the same law provides that the fact that a defendant does not testify shall not be considered as a circumstance against him. You will, therefore, not consider the fact that the Defendant did not testify as a circumstance against him; and you will not during your deliberations allude to, comment on, or in any manner refer to the fact that the Defendant has not testified.

[41] *See Zafiro v. United States*, 506 U.S. 534, 540–41 (1993).

[42] *See, e.g.*, *Johnston*, 127 F.3d at 398.

19

cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored."[43]   Here, the efficacy of the trial court's initial cautionary instructions was diminished by the lack of a strong admonishment following the statements, the fact that the cautionary instruction preceded the problematic statements, the court's overruling of Gongora's objection to the prosecutor's final remark on his silence, and the mixed message resulting from allowing the jury to consider the comments in some respects.

d. *Evidence Supporting Acquittal or Conviction*

We also consider the evidence of guilt and innocence presented at trial. The prosecution maintained throughout that Gongora and Orosco had approached Sierra and that Gongora was the shooter.  This theory relied on the trial testimony of two of Gongora's co-conspirators, Juan Vargas and James Luedtke, both of whom had credibility issues.  The evidence of guilt in this case was not overwhelming, and there was substantial evidence supporting acquittal.

First, the jury had reason to question Vargas's and Luedtke's testimony that Gongora was the shooter.  According to Vargas's initial, written and sworn confession (prior to any plea agreement), Carlos Almanza and James Luedtke approached Sierra and Almanza was the shooter. The statement of Vargas's wife, given to a detective, was consistent with the facts in that first confession. It was only after Vargas was re-interviewed by Detective Ortega (when he was seeking a plea bargain) that Vargas orally contradicted his initial written statement to claim that Gongora and Orosco exited the van to approach Sierra.

Dylan Griffith, with whom Luedtke had lived at the time of the offense, testified that when he met up with Luedtke and the others in Vargas's van after

---

[43] *Richardson v. Marsh*, 481 U.S. 200, 207 (1987) (quoting *Bruton v. United States*, 391 U.S. 123, 135–36 (1968)) (internal quotation marks omitted); *see also Donnelly v. DeChristoforo*, 416 U.S. 637, 644 (1974) (acknowledging that "some occurrences at trial may be too clearly prejudicial for such a curative instruction to mitigate their effect").

No. 07-70031

the shooting, Albert Orosco had a .38 in his waistband and was bragging about having killed a man, saying he took "his dreams" (the words that Luedtke attributed to Gongora). In addition, Griffith testified that Luedtke had originally asked Griffith whether he should tell police that Orosco did it, and when Griffith said Luedtke should tell the truth about whatever happened, Luedtke said he was not "going down" for it.

Moreover, while Vargas replaced Almanza and Luedtke with Gongora and Orosco in his second statement to police, he did not indicate in that statement that he had actually seen Gongora shoot Sierra. Indeed, it would have been difficult for Vargas or Luedtke to have actually seen the shooting, given their positions in the van and the van's location at the time. In addition, the diagram drawn by one of the detectives based on his interview of Vargas shows that Gongora — according to Vargas — would have been walking on the right of Sierra. Luedtke, too, placed Gongora on the right. But Sonia Ramos, the State's lead-off witness and the only independent eyewitness in the case, stated that the man walking on the left of Sierra shot him; her testimony was consistent with forensic evidence that showed a bullet had hit the back, left side of Sierra's head. Vargas's second statement to police had put Orosco on the left. The State offered no explanation of this significant difficulty, which was created by its own witnesses on direct examination.

Second, even taking into account the alternative theory offered to the jury — that Orosco and Gongora entered into a conspiracy to rob Sierra and that Orosco shot Sierra in furtherance of that conspiracy — the evidence against Gongora was far from overwhelming, for at least two reasons. First, the alternative theory not only required the jury to find that Gongora and Orosco entered into a conspiracy to rob Sierra and that Orosco shot Sierra in furtherance of the conspiracy, but also that the shooting "should have been anticipated" by Gongora. Yet the State presented no direct evidence that

21

## No. 07-70031

Gongora should have anticipated a shooting of Sierra by Orosco and made no effort to argue that point in its closing arguments.[44]  Second, there was evidence indicating that *neither* Gongora *nor* Orosco shot Sierra.  Ramiro Enriquez, who had no stake in the case, testified that he was a friend of Almanza in prison and that Almanza had said he did the shooting.  That testimony largely aligned with Vargas's original sworn statement in which he had said that Almanza and Luedtke had approached Sierra and that Almanza was the shooter.  The tension between Vargas's testimony that he saw Gongora shoot Sierra and Vargas's indication that Gongora was on Sierra's right not only cast doubt on Vargas's claim that Gongora was the shooter, but also more generally on the credibility of Vargas's revised account of what occurred.  Gongora's written statement provided to detectives asserted that he was not the shooter; it made no mention of Orosco; and, contrary to the CCA's summary of the evidence, it did not indicate that Gongora approached Sierra.

Finally, the notes sent out by the jury during deliberations suggest that the prosecutor's comments reflected a focus on which of the PLM members in the van had testified and which had not. One note requested Vargas's first statement to the detectives and another asked about Vargas's response to a

---

[44] The dissent insists that "the evidence is overwhelming that, at the very last, Gongora was guilty as a party to capital murder," pointing to Gongora's written statement, in which Gongora admitted that he and others exited the van to "get a little money [from Sierra] and go about our business."  But in its focus on the evidence of Gongora's participation in the conspiracy to rob Sierra, the dissent overlooks the fact that the jury could not convict Gongora unless it also determined that Gongora "should have . . . anticipated" that Sierra's murder would result from carrying out the conspiracy.

No. 07-70031

question from defense counsel about which people were outside the van,[45] hinting that the jury questioned the credibility of Vargas's testimony.

\* \* \*

In sum, the Fifth Amendment violation in this case was not "an isolated comment in a sea of evidence."[46] The violation consisted of repeated comments that began after the court issued its cautionary instruction and continued following each of the court's brief curative instructions. The physical evidence and the statement of the only non-biased eyewitness did not support the co-conspirators' testimony that Gongora was the shooter. The evidence that Gongora at least approached Sierra with Orosco to attempt a robbery was somewhat stronger. However, contrary to the state's contention during closing arguments, the evidence was not "undisputed" that Gongora was guilty as a co-

---

[45] Specifically, Jury Note # 3 stated: "We need the original statement of Juan Vargas of April 27th and his court testimony." The trial court responded that Vargas's original statement to police was not evidence. Jury Note # 5 stated: "On Juan Vargas Statement on Mon March 24th I would like to know when the defense ask[ed] 'who was outside the van' he mention 2 people who were outside the van, what were the names he said." The court responded: "If you wish to receive the testimony, it will be necessary for you to certify that you are in dispute as to a specific statement of the witness, and you should request that part of the witness' statement on the specific point in dispute, and only on that point which is in dispute." The jury then appears to have revised the original note, crossing out "mention" and replacing it with "stated," crossing out "who" (in the phrase "who were outside the van"), crossing out "said" and replacing it with "stated," and adding: "Three jurors could not hear the response of Juan Vargas." The court then responded: "The specific question you requested was not asked. Please specify whether you are asking about a specific question or a general topic on that issue. If you wish to receive the testimony, it will be necessary for you to certify that you are in dispute as to a specific statement of the witness, and you should request that part of the witness' statement on the specific point in dispute, and only on that point which is in dispute." The jury did not resubmit the request. The only other jury note requesting evidence or testimony was Jury Note # 1. That note requested "all evidentiary exhibits, except the bullets," "photos of any who testified that were in the van," and "the easel with all exhibits."

[46] *Cotton v. Cockrell*, 343 F.3d 746, 752 (5th Cir. 2003) (citation omitted) (internal quotation marks omitted) (finding that a comment by the prosecutor was harmless where two non-interested witnesses identified the defendant as the attacker and the defendant had admitted to an acquaintance that he had "killed a D.A."); *see also Nethery v. Collins*, 993 F.2d 1154, 1159 (5th Cir. 1993) (finding that a prosecutor's improper comment did not have a substantial and injurious effect in light of the "overwhelming evidence of guilt").

conspirator, in particular given that the State's main witness had originally identified two others as the people who had approached and killed Sierra — one of whom bragged about the killing to Ramiro Enriquez, an uninvolved party. Indeed, the jury seemed particularly concerned about Vargas's shifting statements as to who had approached Sierra. Ultimately, "when a court is 'in virtual equipoise as to the harmlessness of the error' under the *Brecht* standard, the court should 'treat the error . . . as if it affected the verdict.'"[47] Because the record here leaves us "in grave doubt as to the harmlessness of [the] error," Gongora is entitled to relief.[48]

## V.

Because Gongora was denied a right to a fair trial by the prosecutor's comments in violation of his Fifth Amendment right not to testify, we REVERSE the judgment of the district court, GRANT Gongora's petition for habeas relief, and vacate his conviction. Gongora will be released from custody unless within six months of the mandate of this court he is again brought to trial or the case is otherwise terminated by plea or other disposition under state law.

---

[47] *Fry*, 551 U.S. at 121 n.3 (quoting *O'Neal*, 513 U.S. at 435).

[48] *O'Neal*, 513 U.S. at 437.

No. 07-70031

OWEN, Circuit Judge, dissenting:

The majority opinion seriously misapprehends what constitutes actual harm, and it requires the State to retry Gongora or release him even though the evidence is overwhelming that, at the very least, Gongora was guilty as a party to capital murder. The majority opinion holds that both the Texas Court of Criminal Appeals (TCCA) and the federal district court were unreasonable in denying relief to Gongora. I respectfully dissent. I cannot agree with the majority opinion's conclusion that "the extraordinarily extensive comments [by the prosecutor] on Gongora's failure to testify resulted in actual prejudice."[1] The prosecutor's comments were neither "extraordinarily extensive" nor actually prejudicial.

The prosecutor's problematic statements did not have a "substantial and injurious effect or influence in determining the jury's verdict"[2] of guilt because the jury instructions permitted the jury to convict Gongora of capital murder by finding that he entered into a conspiracy to rob the victim, Sierra, and that Gongora should have anticipated his coconspirator would shoot the victim. The evidence was overwhelming that only two men exited the van to rob the victim. Gongora admitted, in a written confession, that he intended to rob Sierra and that he exited the van. While Gongora claimed that all six occupants got out of the van to commit robbery, every other account of the attempted robbery and shooting was that only two men left the van. The prosecutor's improper comments were focused on convincing the jury that Gongora was the actual shooter, an alternative ground on which the jury could have found Gongora guilty. The prosecutor's comments about Gongora's failure to testify had little,

---

[1] *Ante* at 2.

[2] *Brecht v. Abrahamson*, 507 U.S. 619, 638 (1993) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)) (internal quotation marks omitted).

if any, bearing on Gongora's guilt as a conspirator and responsible party in light of Gongora's own confession that he exited the van to rob Sierra.

With regard to the number and extent of the prosecutor's improper comments, considered in context, the prosecutor commented three times, at most, on Gongora's failure to testify, and these comments were themselves confusing. They were made in conjunction with the prosecutor's arguments about the credibility of two occupants of the van during the shooting who testified at Gongora's trial and on the failure of Gongora to call as a witness his brother Stephen Gongora, who was also in the van during the shooting.

An entirely separate question is whether Gongora's conviction can be upheld since the jury issues allowed the jury to find him guilty of capital murder, as an alternative ground, under Texas's "law of parties," which permits conviction of capital murder on a finding that the defendant anticipated a human life would be taken. The majority opinion does not reach this issue. Though the jury issues may have been infirm under the Eighth Amendment, United States Supreme Court precedent that has not been expressly overruled permits Texas courts to make the finding that Gongora had the requisite mental state to satisfy the Eighth Amendment's requirements. The TCCA made that finding and upheld Gongora's conviction on direct appeal.

I would affirm the district court's judgment denying habeas relief.

**I**

It is apparent that this has been a difficult case for us to resolve. The fact that we ordered oral argument solely on whether a certificate of appealability (COA) was warranted is evidence of the uncertainty we had as to the merits of the issues presented. We nevertheless concluded that a COA should issue.[3] We

---

[3] *Gongora v. Quarterman*, No. 07-70031, 2008 WL 4656992, at *1 (5th Cir. Oct. 22, 2008).

then heard arguments a second time, only then reaching the merits of the two issues now before us, and our consideration of those questions has been lengthy.

The first of the two issues pertains to statements made by one of the prosecutors, Granger, during closing arguments. To put these statements in context, it is helpful to review the closing arguments in their entirety. Another prosecutor, Rousseau, began the State's closing argument. The first point that Rousseau made to the jury was that Gongora could be found guilty even if he was not the "person who pulled the trigger" and that "[t]he evidence in this case is undisputed that the man is guilty as a party. That is without a doubt." With regard to Texas's law of parties, Rousseau told the jury that because of Texas's law of parties, "the answer, is he guilty or not guilty, is an easy question. Yes, he's guilty." The prosecutor then focused on an alternate ground that could support a verdict of a guilt, which was a finding that Gongora was "the one who pulled the trigger." Rousseau said that he would spend most of his time on this issue and proceeded to discuss the evidence that indicated that Gongora shot the victim and why evidence that Albert Orosco was the shooter should be discounted.

Following Rousseau's presentation, an attorney for Gongora began the defense's closing argument. He, too, recounted the evidence, pointing out that Juan Vargas changed his initial statement in which Vargas had said that Carlos Almanza was the shooter and that James Luedtke had exited the van with Almanza. Gongora's counsel conceded to the jury that other than this recanted statement, "Dylan Griffith is the only person that says Carlos [Almanza] did it." The thrust of the argument was that there was varied testimony as to who was the shooter. The candidates included not only Gongora but also Orosco and Almanza. Gongora's other counsel then argued, attempting to convince the jury it should not find that a robbery or attempted robbery occurred because the shooter—either Almanza or Orosco, counsel posited—changed his mind as he

27

No. 07-70031

approached the victim and killed Sierra rather than proceeding with a robbery. The motive for the murder, counsel contended, was some sort of insult from the victim to the shooter. Counsel then discussed the credibility of various witnesses, in particular Juan Vargas's lack of credibility. Little was said to call into question Gongora's guilt as a nonshooter.

Granger then argued for the State. His first point was a reminder to the jury to "[r]emember the law of parties. The law of parties is clear." He discussed the substance of that law, contending that Gongora was guilty of capital murder under it and again asserting that "[t]he law's clear. The law's very much on our side in this case." Granger asked the jury to consider the facts, pointing to Gongora's written confession to establish conspiracy to commit robbery.

Granger then turned to the alternate theory of guilt and examined at some length the varying evidence as to who actually shot the victim. One point that Granger emphasized to the jury was that every witness, including Sonia Ramos, a disinterested person who was driving past as the murder occurred, testified that two men got out of the van to accost the victim. The only contrary evidence was Gongora's written confession, which said that "we all" got out of the van. At a minimum, counsel asserted, the credible evidence established that Gongora was one of those two men. Granger then argued that the consistency of the accounts of what happened "establishes the credibility" of the State's witnesses.

The evidence reflects that there were six people inside the van just before the victim was killed. They were:

Juan Vargas, the driver, who testified
James Luedtke, who testified
Nelson Gongora, the defendant, who asserted the Fifth Amendment
Carlos Almanza, who asserted the Fifth Amendment
Albert Orosco, who asserted the Fifth Amendment
Steven Gongora, the defendant's brother, who was not called as a witness

The prosecutor who presented the final closing argument, Granger, talked to the jury about the two men inside the van who testified, Vargas and Luedtke, and

28

another who was inside the van, Stephen Gongora, who did not testify and who did not assert his Fifth Amendment rights. The prosecutor said, "When [those who had exited to rob the victim] got back inside the van, then consider what was said there." It was then that the statements at issue commenced. Granger told the following to the jury:

> Before you get there, I want to talk about the people you heard from. We're talking about Juan [Vargas] and James [Luedtke] through this entire deal. I used his first name, because, in this case, we have little brothers involved, you know, Steven Gongora, you know, Pablo Vargas. I'm using first names to keep everybody clear.
>
> Who did you expect us to bring to you? There's six people inside that van. When you look at it, here it is. Who would you expect for us to give to you to establish who the shooter is? Are you going to be satisfied in a case with gang members just looking at one person, even though he's telling you the exact truth, no matter what? Even if the time that he first told this story, he told the truth—he told the truth about someone he's scared to death of [Gongora]—this is James Luedtke. He had nothing against him. He had no crime pending. He had no reason to hide the truth. He had no reason to talk to us, but he told us the truth.
>
> You listen to people inside there. *Who else would you want to hear from, though? The shooter? We're not going to talk to that person.* We're not going to make a deal with that person. This person deserves what they get. This person right here. . . . Nelson Gongora, the shooter. That's the person on trial. That's the person who deserves to be found guilty of capital murder.
>
> Who should we go ahead and talk to? *Who should we go ahead and present to you?* Should we talk to the shooter? Should we talk to—

At this point, Gongora's attorney objected, "That's a comment on the failure to testify," and he requested a jury instruction to disregard the comment. He also moved for a mistrial. The trial judge sustained the objection, issued an instruction to disregard, and overruled Gongora's motion for a mistrial.

The prosecutor continued, "Let me say this. And I don't want to give the wrong impression in any sort of way. *We're asking, who do you expect to take the*

*stand?   Who do you expect to hear from, right?"*   Gongora's attorney again objected, and the trial judge instructed the jury to disregard the comment. Gongora's counsel moved for a mistrial, which was denied.

The prosecutor then attempted to address his error:

I don't want—to make it clear, y'all, Defendant has a Fifth Amendment right not to testify.   And, of course—and I don't want to give any wrong impression on that whatsoever.   Okay?

What I want to talk about is this.   When you talk about the credibility of a person, I wish you—and I made a—I made a big mistake there.   I'll make it very clear.   I'm not talking about, do you want to hear from him, because you can't do that.

Gongora's counsel again objected, but that objection was overruled "as to that particular statement."   The prosecutor continued,

Let me back up and tell you this.   Let me define it by the roles in the car.   That's what I'm trying to get at.   Okay?

The roles in the car are this.   You have a person inside the car who is the shooter.   You have a person inside the car who got out with the shooter.   You have a person inside the car who was guilty—or, actually, may have participated in another shooting later that night. You have a person inside the car who is just sitting there who is present.   And then you have a person inside the car who is the Defendant's brother, right?   Where is that person?   We know the person was there.   They could have brought that person, but you never heard from that person.   And that's—

Gongora's counsel interjected an objection, and the judge called counsel to the bench.   Gongora's attorney asserted that bench warrants and subpoenas had been issued, but that "they [the witnesses other than Gongora] took the Fifth." Gongora's counsel also objected that the prosecutor had been pointing to a diagram "showing Albert [Orosco] and everybody else" while commenting on those witnesses', not Gongora's, failure to testify.   The objection was sustained.

One of the State's other prosecutors, Rousseau, then commented for the record, saying,

No. 07-70031

> Immediately—what J.D. [Granger] was talking about there, so it's clear for the record, was that he mentioned the name "Steven Gongora." He mentioned the name, and he said, "The Defendant's brother." And he said, "Where is that person?"
>
> Steven Gongora is the Defendant's brother, and his name is also on the chart, and that's what he was talking about.

The trial judge responded, "All right. You need to clear it up, Counselor." At the request of Gongora's counsel, the judge then reiterated that the objection was sustained, instructed the jury to disregard, and denied Gongora's motion for a mistrial. Granger then continued, *without any further objection by Gongora's counsel*, as follows:

> Ladies and gentlemen, I want to wrap this up, because that's what I'm talking about, the confusion in the case.
>
> When I—when you're talking about the people inside the car, this is it. You have the person inside the van and, from all the testimony, established one person is the shooter. You have a person in the car who got out and could possibly have stopped the killing from ever taking place. You have a person inside the car, by the testimony, you all know was involved in another shooting later that night. You have a person in the car who was related to the Defendant. That is his brother. Right? Then you have a person inside there who is just present. Okay? . . . .
>
> Those are the different roles of the persons inside the car. You ask who—you know, you hear from this case, and who should—you know, how to determine the credibility. Who do you want to hear from? Who do you expect to hear from? The person who wasn't involved at all, that had nothing at all, just present during that deal? Of course, you hear from that person.
>
> When you're considering and evaluating the credibility of the next person—and that's who I'm talking about in talking about who you're going to hear from. I'm talking about, when listening to Juan Vargas, there's different people who played different roles. When you consider the fact that we actually spoke to him, that's what I'm talking about. I'm not talking about who would you want to hear from, who would you expect us to call, but I meant to define it in the terms of the roles of those involved in the case. Okay?

No. 07-70031

The roles that are defined in this case are abundantly clear. When you look at all the roles of those persons involved, the person in this case who is, you know, least culpable, besides the person who didn't do anything, is the driver, right?

That's what I wanted you to consider. That's what I was trying to discuss about the different roles and who you would expect to hear from or expect us, you know, to be looking at. That was it. Just examine their roles.

I agree that the statements italicized in the above quotations were an impermissible comment on Gongora's assertion of his Fifth Amendment rights. However, other of the statements that the panel majority's opinion concludes "strenuously. . . emphasized Gongora's guilt to the jury based on his failure to testify"[4] do not clearly fall into that category. Those statements are instead the prosecutor's explanation of who he meant when he asked, "[D]o you want to hear from him[?]" The statement, "I'll make it very clear. I'm not talking about, do you want to hear from him, because you can't do that," does refer to the Gongora's exercise of his Fifth Amendment rights, but the context of the statement makes clear that the prosecutor, in asking who "do you want to hear from," was referring to Vargas, Luedtke, and Stephen Gongora, the three people in the van who did not assert their Fifth Amendment rights. Similarly, the final two statements italicized in the majority opinion referred to the occupants of the van who did not assert the Fifth Amendment. It is telling that Gongora's counsel did not make *any* objection at trial to these two arguments that the majority opinion says are among five egregious statements. In these final two statements on which the panel majority relies, the prosecutor's point, while clumsily made, was that the State called Vargas and Luedtke as witnesses. Gongora could have called, but did not call, the only other occupant of the van who did not assert the Fifth Amendment, Gongora's brother. Gongora's counsel

---

[4] *Ante* at 17.

32

understood the argument that the prosecutor was making in this regard and did not object.

Gongora argued in his direct appeal to the TCCA that the prosecutor's comments were unconstitutional, but the state court disagreed. The Texas court reasoned, "When viewed in context, the complained-of comments appear to be the prosecutor's attempt to comment on [Gongora's] failure to produce witnesses other than [Gongora], which is a permissible area of comment."[5] The state court acknowledged that the prosecutor's comments "tended to be inartful and often confusing, leading the trial judge to sustain appellant's objections to the remarks and to instruct the jury to disregard them."[6] Nevertheless, the state court concluded that the trial court "did not abuse its discretion in thereafter overruling [Gongora's] various motions for mistrial."[7] The court explained that "[o]n this record, the prosecutor's comments were not so blatant that they rendered the instructions to disregard ineffective," and the trial judge "reasonably concluded that the instructions to disregard effectively removed any prejudice caused by the prosecutor's comments."[8]

On federal habeas review, the district court "concluded that the prosecutor's remarks concerning Gongora's failure to testify amount[ed] to constitutional error."[9] But the district court ultimately held that the constitutional error was harmless. There was no "evidence in the record that [the] remarks 'had substantial and injurious effect or influence in determining

---

[5] *Gongora v. State*, No. AP-74636, 2006 WL 234987, at *10 (Tex. Crim. App. Feb. 1, 2006) (en banc).

[6] *Id.*

[7] *Id.*

[8] *Id.*

[9] *Gongora v. Quarterman*, 498 F. Supp. 2d 919, 927 (N.D. Tex. 2007).

the jury's verdict' as required for the granting of federal habeas relief."[10]  The district court also noted that the trial judge had issued several curative and cautionary jury instructions regarding the Fifth Amendment privilege against self-incrimination.[11]  Because "[j]uries are presumed to follow their instructions," the district court concluded, these instructions further mitigated the harm from the comments.[12]

## II

Gongora may obtain federal habeas relief on his claim of improper prosecutorial comment only if that constitutional error was not harmless.  "[I]n § 2254 proceedings a court must assess the prejudicial impact of constitutional error in a state-court criminal trial under the 'substantial and injurious effect' standard set forth in *Brecht* [*v. Abrahamson*], whether or not the state appellate court recognized the error and reviewed it for harmlessness under . . . *Chapman* [*v. California*, 386 U.S. 18 (1967)]."[13]  In *Brecht*, the Supreme Court established the standard that a constitutional error is harmless unless the habeas petitioner shows that it "had substantial and injurious effect or influence in determining the jury's verdict."[14]

Gongora has not shown that the constitutional error had substantial and injurious effect or influence in determining the jury's verdict.  The first hurdle that Gongora must overcome is the effect of the curative and cautionary jury instructions at Gongora's trial.  I agree with the district court that these instructions mitigated the prejudicial effect of the prosecutor's comments.  The

---

[10] *Id.* (quoting *Fry v. Pliler*, 551 U.S. 112, 116 (2007)).

[11] *Id.*

[12] *Id.*

[13] *Fry*, 551 U.S. at 121-22 (citations omitted).

[14] *Brecht v. Abrahamson*, 507 U.S. 619, 638 (1993).

No. 07-70031

trial judge, in addition to issuing curative instructions during the prosecutor's closing argument, admonished the jurors several times that they could not and must not consider Gongora's choice not to testify as evidence of guilt. The judge issued such cautionary instructions at voir dire and again immediately before closing arguments, when it instructed the jury:

> In a criminal case the law permits the Defendant to testify in his own behalf but he is not compelled to do so, and the same law provides that the fact that a defendant does not testify shall not be considered as a circumstance against him. You will, therefore, not consider the fact that the Defendant did not testify as a circumstance against him; and you will not during your deliberations allude to, comment on, or in any manner refer to the fact that the Defendant has not testified.

Such jury instructions are "powerful tool[s] . . . to protect the [Fifth Amendment] privilege" and give the trial judge a "unique power . . . to reduce" speculation "about why a defendant stands mute in the face of a criminal accusation."[15] Absent a showing to the contrary, we presume that the jury heeded the judge's instructions.[16] On the basis of the record, and considering the evidence of guilt and the presumptively effective jury instructions, the improper comments did not have a substantial and injurious effect or influence in determining the jury's verdict.

Gongora confessed in writing that he intended to rob the victim. He confessed in writing that he left the van to rob the victim. Although he said that everyone else in the van also exited to rob the victim, he is the sole person to give that account. The disinterested eye witness who was driving past as the shooting occurred testified that only two men were accosting the victim. In

---

[15] *Carter v. Kentucky*, 450 U.S. 288, 303 (1981).

[16] *Zafiro v. United States*, 506 U.S. 534, 540-41 (1993); *see also Portuondo v. Agard*, 529 U.S. 61, 67 (2000) ("It is reasonable enough to expect a jury to comply with [a curative] instruction since, as we observed in *Griffin*, the inference of guilt from silence is not always 'natural or irresistible.'" (quoting *Griffin v. California*, 380 U.S. 609, 615 (1965))).

Vargas's original, subsequently withdrawn, statement to authorities as well as his later statement, he said that only two men exited the van to commit the robbery. The jury unquestionably concluded that Gongora was one of those two men and that one of them was armed with the gun that shot the victim. Gongora admitted that he left the van. The only question was who was the actual shooter. The fact that Gongora may not have pulled the trigger did not absolve him of guilt under the charge given to the jury.

Even were the question before the jury limited to whether Gongora was the shooter, there is no actual prejudice demonstrated on the record before us. For the reasons discussed above, the trial judge's instructions were adequate.

The evidence that Gongora was not the shooter is not as strong as the majority opinion suggests. The majority opinion makes much of the testimony of Sonia Ramos, a disinterested witness who was driving past as the shooting occurred. She did now know any of the parties involved. She could say only on which side of the victim the shooter stood. The majority opinion says that Ramos's testimony conflicts with Vargas's placement of Gongora and Orosco. However, it is not at all clear from the record what left or right meant to either Vargas or Ramos in the context of Ramos driving past the scene of the murder at approximately thirty miles an hour and looking back over her shoulder from a vantage point that was different from Vargas's. More importantly, the record about what Vargas said as to the positioning of Gongora and Orosco comes from a diagram drawn by a detective based on his interview with Vargas. Notably, the original diagram, drawn contemporaneously with the interview, does not show Gongora and Orosco in distinct positions. Instead, the diagram contains arrows pointing from "(Nelson / Albert)" to two *X*s marking their position. The detective created the diagram to aid his "own personal understanding" based on his interpretation of Vargas's recollection of the event. Vargas neither created the diagram nor testified to its accuracy at trial.

36

No. 07-70031

In sum, Gongora has not shown that the prosecutor's violations of the Fifth Amendment substantially influenced the jury's verdict that he was guilty of capital murder.

## III

Gongora additionally argues that his sentence of capital punishment violates the Eighth Amendment, as applied to the states pursuant to the Fourteenth Amendment, based upon the Supreme Court's clearly established holdings in *Apprendi v. New Jersey*,[17] *Ring v. Arizona*,[18] and *Blakely v. Washington*,[19] which Gongora says call into question the continued vitality of *Enmund v. Florida*,[20] *Tison v. Arizona*,[21] and *Cabana v. Bullock*.[22] Gongora contends that the "anti-parties" charge as used in Texas is unconstitutional because the jury was never required to find that he committed capital murder either by his own acts or by his substantial participation in the robbery of the victim with at least reckless indifference to the life of the victim. The jury instructions at the conclusion of the guilt/innocence phase of the trial permitted the jury to find Gongora guilty of capital murder if it found that the murder of the victim during the conspiracy to rob him was an offense that should have been anticipated.[23] During the sentencing phase, the questions submitted

---

[17] 530 U.S. 466 (2000).

[18] 536 U.S. 584 (2002).

[19] 542 U.S. 296 (2004).

[20] 458 U.S. 782 (1982).

[21] 481 U.S. 137 (1987).

[22] 474 U.S. 376 (1986), *overruled in part by Pope v. Illinois*, 481 U.S. 497 (1987).

[23] The jury instructions in this case stated, in pertinent part, as follows:

If, in the attempt to carry out a conspiracy to commit one felony, another felony is committed by one of the conspirators, then all conspirators are guilty of the felony actually committed, though having no intent to commit it, if the offense

permitted the jury to find that Gongora either intended to kill the victim or anticipated that a human life would be taken.[24]

The majority opinion did not reach this issue because of its disposition of the Fifth Amendment question. I nevertheless would deny habeas relief in this case because unless and until the Supreme Court overrules its existing precedent, state courts, including state appellate courts, are permitted to make the finding that the defendant had the mental state required to satisfy the Eighth Amendment's requirements.[25]

Under Texas law, it is a capital crime to commit murder in the course of attempted robbery.[26] One who did not actually commit the murder may also be convicted of capital murder under Texas law based on the law of parties. By statute, a defendant who did not kill the victim and who did not intend for the murder to occur may nevertheless be convicted of a capital offense if, in an attempt to carry out a conspiracy to commit a felony, the murder "was committed in furtherance of the unlawful purpose and was one that should have

---

was committed in furtherance of the unlawful purpose and was one that should have been anticipated as a result of the carrying out of the conspiracy. Robbery is a felony.

[24] The issues submitted to the jury at the sentencing phase included "[w]hether the Defendant actually caused the death of the deceased or did not actually cause the death of the deceased but intended to kill the deceased or another or anticipated that a human life would be taken."

[25] *See Hopkins v. Reeves*, 524 U.S. 88, 100 (1998); *Cabana*, 474 U.S. at 392.

[26] The Texas Penal Code provides as follows:

(a) A person commits an offense if the person commits murder as defined under Section 19.02(b)(1) and: . . .

(2) the person intentionally commits the murder in the course of committing or attempting to commit kidnaping, burglary, robbery . . . .

Tex. Penal Code Ann. § 19.03(a)(2).

been anticipated as a result of the carrying out of the conspiracy."[27]  The instructions to the jury in this case permitted the jury to convict Gongora under these statutory provisions.

Pursuant to Texas's capital-sentencing scheme, after the jury found Gongora guilty of capital murder, it was required to answer three special issues to determine whether he was eligible for the death penalty.[28]  Special issue number two asked the jury to answer the following question: "Do you find from the evidence beyond a reasonable doubt that the Defendant actually caused the death of Delfino Sierra or did not actually cause the death of Delfino Sierra, but intended to kill Delfino Sierra or another or anticipated that a human life would be taken?"  Gongora contends that this special issue, combined with the law-of-parties instruction at the guilt/innocence phase of his trial, permitted the jury to sentence him to death on a finding of culpability no greater than that he anticipated a life would be taken, a level of culpability too low to comport with the requirements of *Enmund* and *Tison*.

---

[27] Tex. Penal Code Ann. § 7.02(b).

[28] Article 37.071 of the Texas Code of Criminal Procedure provides that the issues submitted to the jury shall include the following:

(1) whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society; and

(2) in cases in which the jury charge at the guilt or innocence stage permitted the jury to find the defendant guilty as a party under Sections 7.01 and 7.02, Penal Code, whether the defendant actually caused the death of the deceased or did not actually cause the death of the deceased but intended to kill the deceased or another or anticipated that a human life would be taken. . . .

[And if the answers to these questions are in the affirmative:]

[(3)] Whether, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment without parole rather than a death sentence be imposed.

Tex. Code Crim. Proc. Ann. art. 37.071(b), (e)(1).

No. 07-70031

The Supreme Court's decisions in *Enmund* and *Tison* both address the degree of responsibility the Eighth Amendment requires for the imposition of capital punishment after felony-murder convictions. In *Enmund*, the Supreme Court held that the death penalty cannot be imposed upon a defendant who, though involved in a felony, did not kill, attempt to kill, intend that a killing take place, or anticipate that lethal force would be used.[29] In *Tison*, the Supreme Court qualified *Enmund* by holding that "major participation in the felony committed, combined with reckless indifference to human life, is sufficient to satisfy the *Enmund* culpability requirement."[30]

The Supreme Court has also held that the findings mandated by *Enmund* and *Tison* need not be made during trial proceedings.[31] The Supreme Court expressly held that "the Eighth Amendment does not require that a jury make the findings required by *Enmund*."[32] The death penalty may be imposed if "the requisite findings are made in an adequate proceeding before *some* appropriate tribunal—be it an appellate court, a trial judge, or a jury."[33] This holding was reaffirmed in *Hopkins v. Reeves*.[34]

---

[29] *See Cabana*, 474 U.S. at 386 ("*Enmund* . . . imposes a categorical rule: a person who has not in fact killed, attempted to kill, or intended that a killing take place or that lethal force be used may not be sentenced to death."); *see also Enmund v. Florida*, 458 U.S. 782, 798 (1982).

[30] *Tison v. Arizona*, 481 U.S. 137, 158 (1987).

[31] *See Hopkins v. Reeves*, 524 U.S. 88, 100 (1998) ("*Tison* and *Enmund* do not affect the showing that a State must make at a defendant's *trial* for felony murder, so long as their requirement is satisfied at some point thereafter.").

[32] *Cabana*, 474 U.S. at 392.

[33] *Id.* (emphasis added).

[34] *See Reeves*, 524 U.S. at 100 (emphasizing that *Cabana* "held that a State could comply with *Enmund*'s requirement at sentencing or even on appeal").

No. 07-70031

When a federal habeas court reviews a claim that the death penalty has been imposed without the findings mandated by *Enmund* and *Tison*,

> the court must examine the entire course of the state-court proceedings against the defendant in order to determine whether, at some point in the process, the requisite factual finding as to the defendant's culpability has been made. If it has, the finding must be presumed correct . . . , and unless the habeas petitioner can bear the heavy burden of overcoming the presumption, the court is obliged to hold that the Eighth Amendment as interpreted in *Enmund* is not offended by the death sentence.[35]

In this case, the TCCA made the requisite finding on direct appeal, stating, "The testimony in the instant case showed that [Gongora] himself exited the van and shot the victim. Thus, he was a major participant in an offense who possessed 'reckless indifference' towards the murder."[36] As a result, the TCCA rejected Gongora's claim that his death sentence violated the Eighth Amendment.[37]

Pursuant to *Cabana*, the TCCA was permitted to make the requisite *Tison* finding that Gongora was a major participant in the robbery who possessed reckless indifference towards the murder.[38] The TCCA made that finding here, and Gongora's argument that the TCCA unreasonably ignored evidence he believes to be in his favor is not sufficient to overcome the presumption of correctness accorded to the state court's findings.[39] Under *Cabana*, Gongora's death sentence does not violate the Eighth Amendment.

---

[35] *Cabana*, 474 U.S. at 387-88 (citation omitted).

[36] *Gongora v. State*, No. AP-74636, 2006 WL 234987, at *12 (Tex. Crim. App. Feb. 1, 2006) (en banc).

[37] *See id.* ("Considering the evidence, the fact that the jury was authorized by the charge to convict appellant as a party does not make Article 37.071, section 2(b)(2) unconstitutional as applied to appellant in this case.").

[38] *See Cabana*, 474 U.S. at 387.

[39] *See* 28 U.S.C. § 2254(e)(1).

No. 07-70031

Gongora contends, however, that the Supreme Court's decisions in *Ring v. Arizona*[40] and *Apprendi v. New Jersey*[41] clearly established that only a jury, and not a judge, may make the findings mandated by *Enmund* and *Tison*. I do not agree. The Supreme Court has admonished federal courts time and again to construe its holdings narrowly for purposes of federal habeas review, and the Supreme Court "has held on numerous occasions that it is not 'an unreasonable application of clearly established Federal law' for a state court to decline to apply a specific legal rule that has not been squarely established by [the Supreme Court]."[42]

The *Enmund*, *Tison*, and *Cabana* line of cases makes clear that the Eighth Amendment is "a substantive limitation on sentencing, and like other such limits it need not be enforced by the jury."[43] The Supreme Court's decision in *Cabana* explained at some length that its "ruling in *Enmund* does not concern the guilt or innocence of the defendant—it establishes no new elements of the crime of murder that must be found by the jury."[44] This bears repeating. The limitations that the *Enmund* decision found to be imposed by the Eighth Amendment do not add elements to a state's statutory elements of a capital offense. The opinion in *Cabana* makes the following observations at various junctures:

---

[40] 536 U.S. 584 (2002).

[41] 530 U.S. 466 (2000).

[42] *Knowles v. Mirzayance*, 556 U.S. 111, 122 (2009) (internal quotation marks omitted); *see also Wright v. Van Patten*, 552 U.S. 120, 125-26 (2008) (per curiam) (rejecting petitioner's claim under § 2254(d)(1) because "[n]o decision of this Court . . . squarely addresses the issue in this case" and "[b]ecause our cases give no clear answer to the question presented"); *Carey v. Musladin*, 549 U.S. 70, 77 (2006) (rejecting petitioner's claim "[g]iven the lack of holdings from this Court" on the rule urged).

[43] *Cabana*, 474 U.S. at 386.

[44] *Id.* at 385.

*Enmund* "does not affect the state's definition of any substantive offense, even a capital offense." *Enmund* holds only that the principles of proportionality embodied in the Eighth Amendment bar imposition of the death penalty upon a class of persons who may nonetheless be guilty of the crime of capital murder as defined by state law: that is, the class of murderers who did not themselves kill, attempt to kill, or intend to kill.[45]

\* \* \*

We are unable to understand Justice BLACKMUN's statement that we have failed to grasp "the distinction . . . between defining an offense and being entitled to execute a defendant." As stated in the text, we recognize that there is a class of persons whom the State may define as having committed capital murder but whom the State may not permissibly execute. The point we are making, however, is that while the Eighth Amendment prohibits the execution of such defendants, it does not supply a new element of the crime of capital murder that must be found by the jury; hence, such cases as *Cole v. Arkansas*, which hold that the inadequacy of a jury's findings on the issue of guilt or innocence may not be corrected by an appellate court, are inapposite.[46]

\* \* \*

[T]he decision whether a sentence is so disproportionate as to violate the Eighth Amendment in any particular case, like other questions bearing on whether a criminal defendant's constitutional rights have been violated, has long been viewed as one that a trial judge or an appellate court is fully competent to make.[47]

\* \* \*

*Enmund* . . . imposes a categorical rule: a person who has not in fact killed, attempted to kill, or intended that a killing take place or that lethal force be used may not be sentenced to death. Nonetheless, the rule remains a substantive limitation on sentencing, and like other such limits it need not be enforced by the jury.

Indeed, *Enmund* does not impose *any* particular form of procedure upon the States. The Eighth Amendment is satisfied so long as the

---

[45] *Id.* (citations omitted).

[46] *Id.* at 385 n.3.

[47] *Id.* at 386.

death penalty is not imposed upon a person ineligible under *Enmund* for such punishment. If a person sentenced to death in fact killed, attempted to kill, or intended to kill, the Eighth Amendment itself is not violated by his or her execution regardless of who makes the determination of the requisite culpability; by the same token, if a person sentenced to death lacks the requisite culpability, the Eighth Amendment violation can be adequately remedied by any court that has the power to find the facts and vacate the sentence. At what precise point in its criminal process a State chooses to make the *Enmund* determination is of little concern from the standpoint of the Constitution. The State has considerable freedom to structure its capital sentencing system as it sees fit, for "[a]s the Court has several times made clear, we are unwilling to say that there is any one right way for a State to set up its capital sentencing scheme."[48]

If a state were to require in a statute the minimum requirements set forth in *Enmund* and *Tison* as an element of an offense or as a sentencing factor that could increase the severity of a sentence, then the Sixth Amendment, through the Fourteenth Amendment, would require a jury to find the requisite facts. That is the teaching of the decisions subsequent to *Cabana* on which Gongora relies.

The actual *holdings* in *Apprendi* and *Ring* were that when a *state statute* permits punishment to be increased based on the existence of particular facts, a jury must make the factual findings. Although the rationale of *Apprendi* and *Ring* calls into question the reasoning in *Enmund*, *Tison*, and *Cabana*, those cases have not been overruled. Nor are the actual *holdings* in *Apprendi* and *Ring* in conflict with the holdings in *Enmund*, *Tison*, and *Cabana*.

In *Apprendi*, a *state statute* set the maximum penalty for possession of a firearm for unlawful purposes at ten years.[49] However, another *statute* permitted a judge to impose an "extended term" of imprisonment if the judge

---

[48] *Id.* at 386-87 (quoting *Spaziano v. Florida*, 468 U.S. 447, 464 (1984)).

[49] *Apprendi v. New Jersey*, 530 U.S. 466, 468 (2000).

found that the defendant had acted to intimidate a person or a group because of race or other enumerated characteristics or beliefs.[50]  The Supreme Court held that "any fact that increases the penalty for a crime beyond the prescribed *statutory* maximum must be submitted to a jury, and proved beyond a reasonable doubt."[51]  That decision did not consider whether requirements imposed by the Eighth Amendment beyond the *statutory* elements of the offense or *statutory* sentencing enhancements must be found by a jury.

The Supreme Court's decision in *Ring* extended this principle to the capital-punishment context and overruled *Walton v. Arizona*[52] in part.[53]  In so doing however, the Supreme Court discussed the state court's *Enmund* findings,[54] specifically citing *Enmund* and *Tison*, but it did not hold that state courts can no longer make such Eighth Amendment findings.  The only state court findings at issue in *Ring* were the trial judge's finding of one *statutory* aggravating factor, which was that the offense was committed in "an especially heinous, cruel or depraved manner."[55]  In framing the issue that was actually decided, the *Ring* opinion observed that based on the jury's findings alone, only

---

[50] *Id.* at 468-69.

[51] *Id.* at 490 (emphasis added).

[52] 497 U.S. 639 (1990).

[53] *Ring v. Arizona*, 536 U.S. 584, 589 (2002) (citing *Walton*, 497 U.S. 639).

[54] *Id.* at 594 ("Because Ring was convicted of felony murder, not premeditated murder, the judge recognized that Ring was eligible for the death penalty only if he was Magoch's actual killer or if he was 'a major participant in the armed robbery that led to the killing and exhibited a reckless disregard or indifference for human life.'"); *id.* (explaining that the trial judge "concluded that Ring 'is the one who shot and killed Mr. Magoch'" and that "[t]he judge also found that Ring was a major participant in the robbery and that armed robbery 'is unquestionably a crime which carries with it a grave risk of death.'").

[55] *Id.* at 595 (internal quotation marks omitted).

a life sentence could have been imposed under state law.[56] A death sentence could be imposed under the Arizona statute at issue only if "at least one aggravating factor is found."[57] The Supreme Court's actual holding is limited to the issue decided, which was "whether that aggravating factor may be found by the judge, *as Arizona law specifies*, or whether the Sixth Amendment's jury trial guarantee . . . requires that the aggravating factor determination be entrusted to the jury."[58] The Court did not address whether the *Enmund* findings must be made by a jury. The Supreme Court overruled *Walton* only to the extent that *Walton* held that *statutorily* required aggravating factors could be found by a state judge or appellate court.[59]

Neither *Ring* nor *Apprendi*—nor any other decision of the Supreme Court—has explicitly overruled *Cabana*'s holding that a trial judge or appellate court may make the Eighth Amendment findings mandated by *Enmund* and *Tison*. The Supreme Court has repeatedly "reaffirm[ed] that '[i]f a precedent of [the Supreme Court] has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to [the Supreme Court] the prerogative of overruling its own decisions.'"[60] Whether the Supreme Court will continue to adhere to the reasoning and holdings of *Enmund*, *Tison*, and *Cabana*

---

[56] *Id.* at 597.

[57] *Id.* (internal quotation marks omitted).

[58] *Id.* (emphasis added).

[59] *See id.* at 598-99, 609; *id.* at 609 ("[W]e overrule *Walton* to the extent that it allows a sentencing judge, sitting without a jury, to find an aggravating circumstance necessary for imposition of the death penalty.").

[60] *Agostini v. Felton*, 521 U.S. 203, 237 (1997) (second alteration in original) (quoting *Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484 (1989)); *see also State Oil Co. v. Khan*, 522 U.S. 3, 20 (1997) ("[I]t is this Court's prerogative alone to overrule one of its precedents.").

No. 07-70031

is highly questionable.  However, because no clearly established holding of the Supreme Court overruled *Cabana*'s holding that an appellate court may make the findings mandated by *Enmund* and *Tison*, Gongora's second claim must fail.

*     *     *

In conclusion, I would deny Gongora's application for a writ of habeas corpus because neither of his claims satisfy the requirements for a grant of the writ.